Richard W. ZAMORE and Patricia Zamore

v.

George D. WHITTEN.

Supreme Judicial Court. of Maine.

Dec. 4, 1978.

Bernstein, Shur, Sawyer & Nelson by Peter J. Rubin (orally), Portland, for plaintiffs.

Bennett, Kelly & Zimmerman, P. A. by Peter H. Jacobs (orally), Peter J. DeTroy, III, Portland, for defendant.

Before ARCHIBALD, DELAHANTY and GODFREY, JJ., and DUFRESNE, A. R. J.

DUFRESNE, A. R. J.[1]

Richard W. Zamore and Patricia Zamore, the husband and wife appellants, on August

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered

15, 1973 brought suit against George D. Whitten, the appellee, in Superior Court, Cumberland County, to recover damages for the alleged breach by Whitten of a contract to purchase their seventy-five shares of stock in Walbridge Bros., (Walbridge), a Maine corporation, for the sum of $20,000.00. On April 1, 1975 the Zamores won a jury verdict in the amount of $10,-000.00, which the presiding Justice subsequently set aside on timely motion, ordering a new trial on all issues. At the second trial, the jury again found in favor of the Zamores, but this time their verdict was $8,927.20. Both parties were dissatisfied with the result; so, Whitten moved for a judgment notwithstanding the verdict, while the Zamores made a motion for a new trial on the issue of damages. The Zamore motion was denied, but Whitten's motion was granted and judgment was entered for the defendant-appellee pursuant to the Court's order. The plaintiffs-appellants have filed timely an appeal from the judgment, contending that the rulings of the Court on the respective motions were erroneous.

We deny their appeal.

## Summary of Facts

Mr. Zamore had been employed as general manager to run the business of Walbridge and did so until sometime in March of 1972 when he was fired by his brother-in-law, Mr. Whitten (their wives are sisters). The defendant-appellee owned a two-thirds interest in Walbridge or one hundred and fifty shares of stock as compared to the plaintiffs-appellants' ownership of seventy-five shares or a one-third interest in the business. Following his dismissal, Mr. Zamore received from Mr. Whitten in May of 1972 the following letter:

"May 23, 72

Ditch

Please have you and Pat sign these papers. When Walbridge gets on its feet within a year your third interest will be worth $20,000 and I will see you get that or more as things get straightened out.

George."

The reference papers[2] enclosed with the above stated letter were promptly signed and mailed to Whitten as had routinely been done in the past in the course of the corporate dealings between the parties, but nothing was said by the Zamores at that time respecting Mr. Whitten's suggestion respecting the Zamore stock. The next communications between the parties took place in December 1972, when Mr. Whitten talked to Mr. Zamore over the phone on two separate occasions. The first conversation was enlisted by Mr. Whitten who invited the Zamores to spend Christmas with him at Sugarloaf (a ski resort). Mr. Zamore quoted Mr. Whitten as saying that they would have their twenty thousand by January 15th or February 1st at the latest, that he did not believe the stock was worth more than twenty thousand because the master plumber had gone sour and they had hired a new one and he had gone sour too. The second conversation came about when Mr. Zamore called Mr. Whitten to let him know that the appellants would not be going to Sugarloaf for Christmas. Mr. Zamore stated that in this second conversation Mr. Whitten again assured him that they would have their twenty thousand by January 15th or by February 1st at the latest (which "arrangement," so Mr. Zamore testified, he indicated to Mr. Whitten was "satisfactory to him") and that, if Mr. Whitten did not get in touch with him by February 1st, he, Mr. Zamore, should call him. Calling in late February, Mr. Zamore could not reach Mr. Whitten. During the entire sequence

and authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. These papers consisted of three documents concerning a Walbridge Bros. shareholders' meeting held May 4, 1972: (1) a waiver of notice of the meeting; (2) a copy of the minutes of the annual meeting of Walbridge Bros. and (3) a confirmation of record.

of these related events Walbridge had been plagued with financial difficulties and the value of the corporate stock was "nominal."

### Appellants' Contention

The Zamores assert that the evidence presented a factual question for the jury to resolve. They contend that as fact finders the jury could find either that an unconditional bilateral contract existed in relation to the sale and purchase of their shares of stock in Walbridge Bros., or that the bilateral contract agreed upon was a conditional one but that the appellee either waived the condition or is estopped from asserting its non-fulfillment. We disagree.

### Motion for Judgment Notwithstanding the Verdict

Having moved the Court for a directed verdict at the close of all the evidence but without success, the defendant-appellee, following the jury verdict against him and the entry of judgment in accordance therewith, properly and seasonably filed with the Court, pursuant to Rule 50(b), M.R.Civ.P., a motion to have the verdict and the judgment entered thereon set aside and to have judgment entered in accordance with his previous motion for a directed verdict. See *Patterson v. Rossignol*, Me., 245 A.2d 852 (1968). Even though the case was submitted to the jury on the theories espoused by the plaintiffs-appellants and full instructions had been given them in connection therewith, the Justice below concluded that

> "as a matter of law, the Plaintiffs have failed to establish that there was an enforceable contract between them and the Defendant,"

and, therefore, vacated the judgment in favor of the plaintiffs-appellants, granted the motion for judgment notwithstanding the jury verdict and ordered the clerk to enter judgment for the defendant-appellee without costs, denying at the same time the plaintiffs-appellants' motion for a new trial on damages. In this, there was no error.

In determining whether the presiding Justice erred in granting the appellee's motion for judgment notwithstanding the verdict, the appropriate standard is, whether the jury verdict could be sustained on any reasonable view of the evidence, bearing in mind our duty as an appellate court to look at the evidence, together with all justifiable inferences therefrom, in the light most favorable to the party in whose favor the jury verdict was returned. *Manchester v. Dugan*, Me., 247 A.2d 827 (1968); *George v. Guerette*, Me., 306 A.2d 138 (1973). The test to be used to determine the propriety of granting a motion for judgment notwithstanding the verdict is the same as that to be applied in the case of a motion for a directed verdict. *Cole v. Lord*, 160 Me. 223, 202 A.2d 560 (1964); *Gowell v. Thompson*, Me., 341 A.2d 381 (1975); *Rand v. B. G. Pride Realty*, Me., 350 A.2d 565 (1976). See *Boetsch v. Rockland Jaycees*, Me., 288 A.2d 102 (1972).

The Zamores initially contend that the evidence produced at trial, such as the Whitten letter of May 23, 1972 in connection with the two December telephonic conversations, was sufficient to support the formation of an unconditional bilateral contract for the purchase and sale of their Walbridge stock under contract law principles. We hold that the appellants' contract theory must fail in light of their failure at trial to produce any evidence of consideration.

At common law, in order to prove the existence of a contract, the proponent must adduce credible evidence that an offer was made which was then accepted by a communication in the same medium purporting to accept it in the exact terms of the offer. See e. g. *Jenness v. Mount Hope Iron Company*, 53 Me. 20 (1864). An uncommunicated intention is insufficient in any case to constitute such an acceptance of a proposition as to create a binding contract. Whatever may have been the proposal tendered in the letter of May 23, 1972, there was no responsive communication thereto and silence is not a legal substitute for acceptance.

> "In the construction of contracts there is one fundamental rule or consideration which is paramount to all others, and that is, that the intention of the parties, as gathered from the language of all parts

of the agreement considered in relation to each other and interpreted with reference to the situation of the parties, and the manifest object which they had in view, must always be allowed to prevail unless some established principle of law or sound public policy would thereby be violated." *Bell v. Jordan*, 102 Me. 67, 65 A. 759 (1906).

There must be a meeting of the minds of the parties to the contract, i. e., a mutual assent to be bound by its terms, and that *mutual assent of the parties to the terms agreed upon* must be reflected and manifested in the contract, either expressly or impliedly. Such is essential to the formation of a contract. *Belfast & Moosehead Lake Ry. Co. v. Inhabitants of Unity*, 62 Me. 148 (1871); *Forbes v. Wells Beach Casino, Inc.*, Me., 307 A.2d 210, 216 (1973).

A mere declaration of intention to enter into an agreement at some time in the future, even if the terms are stated with definite specificity, is not an offer which can be accepted to form a binding contract. *Forbes v. Wells Beach Casino, Inc.*, supra, at 216; Restatement, Contracts, § 27 (1932).

On the other hand, the acceptance or confirmation made in reference to the instant prior alleged offer to the effect that "[w]hen Walbridge gets on its feet within a year your third interest will be worth $20,-000 and I will see you get that or more as things get straightened out," in such conclusory and indefinite generalities as "the arrangement is satisfactory," is legally ineffectual to constitute a valid acceptance resulting in a binding contract, because, even if it be assumed that the so-called "offer" was an outright offer to purchase the Zamore stock on the part of Mr. Whitten, the so-called confirmatory "acceptance" by Mr. Zamore lacked positive and distinct language or action of binding effect upon the Zamores to sell their stock. The phone conversations are subject to the same disabilities as the original passive conduct of Mr. Zamore to the original Whitten letter. See *Ruebsamen v. Maddocks*, Me., 340 A.2d 31 (1975).

The construction of an unambiguous written contract is a question of law for the Court. *Blue Rock Industries v. Raymond International, Inc.*, Me., 325 A.2d 66 (1974); *Harmon v. Roessel*, 153 Me. 296, 137 A.2d 374 (1957). An agreement, complete in itself, speaks for itself. Its meaning, the promises it makes and the duties or obligations it imposes, are questions of law for the court. *Hoyt v. Tapley*, 121 Me. 239, 116 A. 559 (1922); *Nash v. Drisco*, 51 Me. 417 (1864).

The only time when a writing will present a jury question is when the language employed is ambiguous or there is either an exchange of correspondence or an oral conversation of such a nature as to create doubt as to what was intended or should reasonably have been understood. *Wiggin v. Sanborn*, 161 Me. 175, 210 A.2d 38 (1965).

It is accepted doctrine that every contract not under seal requires "consideration" to support it; any promise which is not supported by consideration is unenforceable. The consideration may consist in some benefit to the promisor or some loss or detriment to the promisee. *Congregation Beth Abraham v. People's Savings Bank*, 120 Me. 178, 113 A. 53 (1921). Also, a party's agreement or promise to sell would be sufficient consideration to give binding efficacy to an agreement or promise to buy on the part of the other party. *Appleton v. Chase*, 19 Me. 74 (1841); *Babcock v. Wilson*, 17 Me. 372 (1840).

The alleged contract involved in this case concerns the purchase and sale of shares of stock in Walbridge Bros., a Maine corporation. The Court below decided as a matter of law that the dealings between the parties consisting of Whitten's letter of May 23, 1972 taken in connection with the two oral conversations in December, showed conclusively the absence of any consideration to support Whitten's alleged promise to "purchase" the Zamore stock, and, therefore, that no contract existed between the parties for the breach of which the defendant-appellee would be liable in damages.

The previously stated principles of law applicable to the formation of contracts may be readily recognized as part of our common law development and attainment prior to the adoption in this State in 1963 of the Uniform Commercial Code (UCC). Thus, a preliminary question below, in determining the issue whether a contract for the sale of the Zamore stock had been entered into by the parties, was whether the provisions of the UCC were applicable in the resolution of the problem. This Court has had no occasion to decide the point so far.

We take notice that, prior to the enactment of the Uniform Commercial Code, our Legislature had adopted the Uniform Sales Act in 1923 (P.L.1923, c. 191) and the Uniform Stock Transfer Act in 1943 (P.L.1943, c. 266), but these were expressly repealed in the UCC (see P.L.1963, c. 362, s. 34 and s. 7). The UCC, however, as expressly stated in 11 M.R.S.A. § 1–102, was intended to promote its underlying purposes and policies, such as, among others, "to simplify, clarify and modernize the law governing commercial transactions [and] to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Implementing this broad design of codifying the rights and obligations of parties to "commercial transactions" in the light of the progressive expansion of these rights and obligations by reason of evolutional customary and usual practices in the world of commerce, the UCC purported to deal with the various subjects of commercial transactions, such as in Article 2, with Sales generally; in Article 3, with Commercial Paper; in Article 4, with Bank Deposits and Collections; in Article 5, with Letters of Credit; in Article 6, with Bulk Transfers; in Article 7, with Warehouse Receipts, Bills of Lading and Other Documents of Title; in Article 8, with Investment Securities; in Article 9, with Secured Transactions, Sales of Accounts, Contract Rights and Chattel Paper.

It would appear that the Zamore stock was not an "investment security" within the meaning of that term under that part of the UCC relating to "Investment Securities." 11 M.R.S.A., § 8–102(1)(a) states that a "security" means, unless the context otherwise requires, an instrument which

"(i) Is issued in bearer or registered form; and

(ii) *Is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment*; and

(iii) Is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) Evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer." (Emphasis supplied)

Although the record is silent thereon, it is apparent that the reference stock in this close family corporate business is not of a type "commonly dealt in upon securities exchanges or markets," nor is it commonly recognized in any area securities exchanges or markets as a medium for investment. See *Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166, 323 N.Y.S.2d 39, 43 (1971), where the New York Court held that the term "investment securities" as defined in Article 8 of the Uniform Commercial Code did not include cooperative apartment stock.

However, do the UCC rules apply by reason of Article 2 governing transactions in "goods"? 11 M.R.S.A., § 2–102. The New York Court in *Silverman* said it did. But, 11 M.R.S.A., § 2–105 defines "goods" within the meaning of the "Sales" portion of the Uniform Commercial Code as

"all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale *other than* the money in which the price is to be paid, investment securities (Article 8) and *things in action*. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from

realty (section 2–107)." (Emphasis provided)

It is to be noted that, unlike the unborn young of animals, growing crops and identified things to be severed from realty, this definition of "goods" does not specifically mention shares of corporate stock which are not investment securities under Article 8. Furthermore, the stated definition of "goods" expressly excludes "things in action," also commonly known as "choses in action." The definition of the term "goods" under the UCC closely tracks the signification given to it in the former Uniform Sales Act. R.S.1954, c. 185, § 76.

" 'Goods' include all chattels personal *other than things in action* and money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale." (Emphasis added)

Some courts in other states that had adopted the Uniform Sales Act, as had Maine before the enactment of the UCC, have ruled that shares and certificates of stock are choses in action or in the nature of such intangible type of property and are not included in the term "goods" as defined in such Acts. *In re Carter's Claim*, 390 Pa. 365, 134 A.2d 908 (1957); *Porter v. Gibson*, 25 Cal.2d 506, 154 P.2d 703 (1944); *Guppy v. Moltrup*, 281 Pa. 343, 126 A. 766 (1924); *Smith v. Lingelbach*, 177 Wis. 170, 187 N.W. 1007 (1922); *Millard v. Green*, 94 Conn. 597, 609, 110 A. 177, 181, 9 A.L.R. 1610 (1920). See also *Goodhue v. State Street Trust Co.*, 267 Mass. 28, 165 N.E. 701 (1929).

The New York courts, however, have taken an opposite position and held that, even though the courts have the duty to formulate the rules applicable in cases not covered by the Uniform Sales Act, they should, for the sake of promoting uniformity, guide themselves in formulating them upon the provisions of the Act which govern analogous matters or situations. Thus, the New York Court in *Agar v. Orda*, 264 N.Y. 248, 190 N.E. 479, 99 A.L.R. 269 (1934) held that, by analogy, the provisions of the Uniform Sales Act respecting the sale of "goods" applied to the sale of certificates of stock. The same conclusion was reached in *Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166, 323 N.Y.S.2d 39 (1971), where the Court held that shares of cooperative stock relative to a proprietary lease were "goods" within Article 2 of the Uniform Commercial Code.

The rationale behind the New York rule stems from the fact that certificates of stock, into which for all practical purposes the underlying shares they represent become merged, are instrumentalities of trade and commerce and are so treated in the commercial world. From this, it is concluded that the rules governing sales of goods and other personal property should similarly apply to sales of stock.

Other courts have looked for guidance to the provisions of the Uniform Commercial Code in their formulation of similar rules to be applied by analogy to situations not covered by the Code. See *Colt v. Fradkin*, 361 Mass. 447, 281 N.E.2d 213 (1972); *E. F. Hutton & Co. v. Manufacturers Nat. Bank of Detroit*, D.C., 259 F.Supp. 513 (1966); *Kroeze v. Chloride Group Ltd.*, 572 F.2d 1099 (5th Cir. 1978).

Our own Court has given some indication of applying UCC principles to a transaction not strictly within the terms of the Code in *Dehahn v. Innes*, Me., 356 A.2d 711, 718 (1976), where we held that an "entire" contract involving the sale and purchase of items of personalty and real estate would be governed by the statute-of-frauds provisions of 11 M.R.S.A., § 2–201, notwithstanding that the subject matter of the contract did not come precisely within the Code's stated scope of its reach—transactions in goods: § 2–102—nor within the given definition of "goods" in § 2–105.

The Maine Court, prior to the adoption of the Uniform Sales Act, had similarly expanded the statute of frauds governing the validity of contracts for the sale of any "goods, wares, or merchandize," for thirty dollars or more to include contracts for the sale of shares in a joint stock company. *Pray v. Mitchell*, 60 Me. 430 (1872).

We do have in mind the distinction between shares of stock and stock certificates. A share of stock is a proportional ownership in the corporation itself, never realized except upon dissolution and winding up of the corporation, but providing the right in the meantime to receive such profits as may be made and declared in the form of dividends, and as such is a species of incorporeal and intangible property in the nature of a chose in action. A stock certificate, on the other hand, generally accepted as a symbol or paper evidence of the stock ownership or proportional property interest in the corporation itself, is regarded as a tangible corporeal thing and a regular article of commerce, the subject not only of ownership, but of possession or right to possession. See *Strout, Admr. v. Burgess,* 144 Me. 263, 68 A.2d 241, 12 A.L.R.2d 939 (1949); *Mills v. Jacobs,* 131 Pa.Super. 469, 200 A. 233 (1938); *Duncan v. Kelly,* 435 S.W.2d 29 (Mo.App.1968).

In the instant case, the evidence did show that a certificate of stock had been issued to Richard W. Zamore and Patricia F. Zamore, certifying that they were the owners as joint tenants and not as tenants in common of 75 shares of the common capital stock of Walbridge Bros. Assuming without deciding that certificates of stock ownership are "goods" within the meaning of 11 M.R.S.A., § 2–105 or, in the alternative, that we should look for guidance to the provisions of the Uniform Commercial Code in determining whether the parties did enter into an enforceable contract of sale of this stock, the plaintiffs would fare no better than if the decision were made solely on common law principles. We have in mind the more liberal approaches of the Code to the formation of contracts, its basic policy being (1) that a contract for the sale of goods may be made in *any manner* sufficient to show agreement of the parties, including conduct by both parties which recognizes the existence of the contract, even though the moment of its making may be undetermined and one or more terms may have been left open (§ 2–204), and (2) that an offer to make a contract, unless otherwise unambiguously indicated by the language or circumstances, shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances (§ 2–206).

Notwithstanding these broad directives of the Code, a review of the evidence convinces us that the appellants have failed in their attempted proof of a bilateral contract of the sale of their stock. There is no evidence of any intention on their part to be bound by any contract to sell their stock to Mr. Whitten. There is no corresponding promise to sell made by the Zamores to Whitten's alleged promise to buy. Mr. Zamore's conclusory statement to Whitten that the arrangement was satisfactory to him was a mere acknowledgment by Zamore of appreciation for Whitten's efforts in seeing that the appellants get $20,000 or more for their interest in the corporation as Walbridge Bros. gets on its feet and things are straightened out. There is not a scintilla of evidence that Mrs. Zamore participated in any contractual undertaking at any time with intent to bind herself to a contract of sale.

The Code's liberality did not displace the basic common law requirement of contract law that the parties must have intended to conclude a binding agreement and that a promise must be supported by consideration. This record furnishes no basis, either expressly or by inferential proof, that any binding mutual obligation was ever intended.[3]

---

3. The phrase "mutuality of obligation" has caused much confusion to courts and commentators over the years. Professor Corbin criticizes the expression for its tendency to connote a need for obligations equivalent in terms of detriment and value. See 1A Corbin on Contracts, § 152 (1963).

In fact, mutuality embodies a particularized application of the consideration doctrine in the context of formation of a bilateral contract. In a bilateral contract, one promise is good consideration for another. If the promisee fails to give the required return promise, mutual obligations are not, in fact, created. It is less confusing, and equally accurate, however, to conclude that no contract exists due to the promisee's failure to give legally sufficient consideration. See also 1 Williston on Contracts, § 105A (3d ed. 1957).

Furthermore, we do not view any loss incurred by the appellants as a consequence of their retention of the Walbridge stock during 1972–73 as legal detriment supplying consideration for any promise by the appellee.

This Court held in *Bigelow v Bigelow*, 95 Me. 17, 22, 49 A. 49, 51 (1901) that

"it would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform."

In *Bigelow*, the direction of a verdict in favor of the defendant-promisor was reversed on appeal, where the evidence disclosed testimony enabling the trier of facts to find that the promisee, in reliance upon the defendant's promise and at his request, had left his employment and moved to a certain farm.

The appellants' retention of their stock which dropped in value to virtually nothing in May of 1973 from $26,774.62 the year before, as a matter of law under the facts of this case, does not constitute legal detriment as consideration for the appellee's alleged promise upon any theory of the existence of a legal contract to forbear disposing of the stock. The doctrine of forbearance as legal detriment in support of a legal contract prerequires, expressly or inferentially, a request from the promisor for the promisee's forbearance, the promisee's promise to forbear followed by forbearance. Forbearance is not valid consideration where both request and promise to forbear is absent. *Lambert v. Clewley*, 80 Me. 480, 15 A. 61 (1888). Here, there was no such request from Whitten nor any such promise by the Zamores. Forbearance or omission to act, as well as acts performed, in reliance

upon a promise cannot constitute a consideration therefor and transform the naked promise into a contract, unless the forbearance or the performance as the case may be is, in the legal sense, at the request of the promisor. See *LaFlamme v. Hoffman*, 148 Me. 444, 95 A.2d 802 (1953); *Shaw v. Philbrick*, 129 Me. 259, 151 A. 423 (1930).

The Justice below committed no error in ordering the entry of judgment for the defendant on the basis that, as a matter of law, the plaintiffs-appellants had failed to establish that there was an enforceable contract between them and the defendant.[4]

The entry will be

Appeal denied.

Judgment affirmed.[5]

POMEROY, J., did not sit.

WERNICK, J., sat at oral argument, but did not participate further.

---

**4.** Both parties to this appeal vigorously argued, and extensively briefed, the issue of the existence vel non of a conditional contract and in relation thereto the nature and consequences of the condition. Our conclusion that the evidence does not support the existence of any valid contract renders any discussion of contractual conditions superfluous.

**5.** Our holding that the presiding Justice committed no error in granting the appellee's motion for judgment notwithstanding the verdict, of necessity, demonstrates no error on his part in denying the appellants' motion for a new trial on the issue of damages.