Robert P. **BAHRE**

v.

Robert C. **PEARL.**

and

Robert P. **BAHRE**

v.

Richard T. **COOK** and David H. **Cook.**

Supreme Judicial Court of Maine.

Argued April 29, 1991.

Decided July 26, 1991.

Michael T. Healy, (orally), Gregory S. Fryer, Verrill & Dana, Gerald F. Petrucelli (orally), Michael K. Martin, Petrucelli, Cox & Martin, Portland, Me., for plaintiff.

Michael E. Carpenter, Atty. Gen., Linda J. Conti, Asst. Atty. Gen., Augusta, Me., for amicus curiae, Securities Administrator.

Richard L. O'Meara (orally), Peter L. Murray, Murray, Plumb & Murray, Portland, Me., for Cooks.

U. Charles Remmel, (orally), Graydon G. Stevens, Kelly, Remmel & Zimmerman, Portland, Me., for Pearl.

Before McKUSICK, C.J., and ROBERTS, GLASSMAN, CLIFFORD, and COLLINS, JJ.

GLASSMAN, Justice.

In this consolidated appeal the defendants, Robert C. Pearl and Richard T. Cook and David H. Cook, appeal from separate judgments of the Superior Court (Cumberland County, *Brennan, J.*) granting summary judgments for the plaintiff, Robert P. Bahre, on his complaints to recover amounts due on promissory notes executed by the defendants in conjunction with an agreement to dissolve the general partnership of the parties and on the defendants' counterclaims alleging that Bahre violated the Revised Maine Securities Act (RMSA), 32 M.R.S.A. §§ 10101–10711 (1988 & Supp. 1990), by his failure to register certain partnership interests he sold to the defendants and for which the promissory notes allegedly served as consideration. All of the defendants challenge the court's determination that the partnership interests sold to the defendants were not securities as defined by the RMSA. In addition, Pearl contends that the court erred in granting Bahre's motion for the prejudgment attachment of corporate stock owned by Pearl and requiring Pearl's deposit of the shares of such stock with an escrow agent and in the terms of its award of postjudgment interest to Bahre. We modify the judgment for Bahre against Pearl as it relates to the award of postjudgment interest to Bahre and affirm the judgment for Bahre against the Cooks.

On June 19, 1986, by the execution of a general partnership agreement, Long Wharf Associates was formed for the purpose of acquiring and developing property along the Portland waterfront. The original partners consisted of the Liberty Group, Inc., Michael Liberty, and David Cope ("Liberty"), who served as managing partners and collectively held a one-half interest in the partnership, and Bahre and his son, who collectively held the remaining one-half interest. Beginning in June 1986, Bahre personally guaranteed a partnership development loan ($1.2 million) and negotiated a personal loan ($2.5 million) with Casco Northern Bank, contributing the proceeds of the latter loan to the partnership as a capital contribution. Soon thereafter, Bahre decided to reduce his personal obligation arising from these loans and asked Liberty to seek out additional partners.

Liberty found seven new "guarantor partners," including Pearl and the Cooks, who assumed a percentage of Bahre's loan obligations in consideration for an assignment of a corresponding percentage of Bahre's ownership interest in the general partnership.[1] Neither Liberty nor Bahre registered these partnership interests with the Superintendent of Banking. *See* 32 M.R.S.A. § 10401. Although Liberty continued as managing partner with control over the day-to-day operations of the partnership business, the general partnership agreement enumerated several rights held by all partners, either individually or collec-

---

1. Pearl assumed a 19.84127% interest in the partnership and 39.68254% of the loan obligation. The Cooks each assumed a 2.33645% interest in the partnership and 4.6729% of the loan obligation.

tively, to participate in certain major decisions of the partnership.

The partnership agreement required regular monthly meetings of the partners, but none were held until 1988 when the partnership began to experience serious financial difficulties and Liberty convened a series of meetings, which all the partners attended. The partnership ultimately failed, and the partners entered into a dissolution agreement in December 1988 in which the defendants agreed, *inter alia,* to execute demand promissory notes to Bahre in an amount equal to their percentage of the previously assumed obligation of the Casco Bank loan. Casco demanded payment from Bahre in October 1989, at which time Bahre paid the bank in full and demanded payment from Pearl and the Cooks on their respective promissory notes.

When the defendants failed to make these payments, Bahre instituted the current suits against the defendants to collect amounts due under the promissory notes plus accrued interest. The court granted Bahre's motion for a prejudgment attachment against Pearl in the amount of $1 million. Pursuant to 11 M.R.S.A. § 8–317(6) (1964 & Supp.1990), the court later granted Bahre's motion, made in conjunction with a motion to renew the attachment, to order Pearl to deliver to an escrow agent certain shares he owned in two corporations.

In their answers to the complaints filed by Bahre the defendants alleged by affirmative defense and counterclaim that, be-

cause the partnership interests sold to them by Bahre were securities as defined by section 10501(18) of the RMSA, section 10401 required that a registration statement be filed with the Superintendent of Banking prior to any offer or sale of these interests.[2] The defendants argue that section 10605 of the RMSA therefore allows them to sue to recover from Bahre the consideration paid to Bahre for these partnership interests, or in the instant cases, the amount of the promissory notes executed by the defendants at the dissolution of Long Wharf Associates.[3]

In his answer to the defendants' defenses and counterclaims, Bahre alleged that the general partnership interests were not securities for purposes of the registration requirements of section 10401 of the RMSA and that, in any event, the two-year limitations provision of section 10606 barred the defendants' suit to recover the consideration paid for these interests.[4] Bahre also filed a motion for a summary judgment in each case. In their opposition to the motions for summary judgment, Pearl and Richard Cook filed affidavits stating that their role in the Long Wharf Associates had been exclusively as passive investors and that they were therefore entitled to the protections of the RMSA.

After a hearing, the court granted a summary judgment for Bahre on both of his complaints and for Bahre on both of the defendants' counterclaims, but did not specify the grounds for the decisions. The judgment entered against Pearl was in the

---

**2.** Section 10401 provides that "[a] person may not offer to sell any security in this State unless the security is registered under this Act or the security or transaction is exempt under this Act."

**3.** Section 10605 provides, in pertinent part:

Any person who offers or sells a security in violation of section 10201, 10205, 10301, 10401, or 10405, subsection 8, or any rule of the administrator relating to those sections or any condition imposed under section 10405, subsection 7, is liable to the person purchasing the security from that person. The person purchasing the security may sue to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs and reasonable attorneys'

fees less the amount of any income received on the security, upon tender of the security, or for damages plus costs and reasonable attorneys' fees if the person no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition....

**4.** Section 10606 provides:

No person may sue under section 10605, unless suit is brought within 2 years after the violation, except that, if liability arises under subchapter II, suit must be brought within 2 years after the discovery of the violation or after discovery should have been made by the exercise of reasonable diligence.

amount of $937,537.05, which included $785,005.59 in principal, accrued interest in the amount of $130,896.39, and attorney fees of $17,671.07. A judgment was entered against Richard Cook in the amount of $113,277.17 and against David Cook in the amount of $111,200.29. The defendants appeal from these two judgments, and the cases have been consolidated for appeal.

### I.

■ The defendants contend that the interests they purchased in Liberty Associates were in the nature of "investment contracts," that Bahre's assignment violated the provisions of the RMSA requiring a pre-offer registration of this type of security, and that this violation constitutes a defense to Bahre's claim to collect on the promissory notes executed by the defendants as part of the partnership dissolution agreement. We disagree.

This is a case of first impression in Maine. The federal securities acts, see 15 U.S.C. §§ 77a–77bbbb (1983 & Supp.1991) (Securities Act of 1933); 15 U.S.C. §§ 78a–78 ll (1983 & Supp.1991) (Securities Exchange Act of 1934), and the Revised Maine Securities Act are perceived as remedial statutes. The term "security" has generally been broadly and flexibly construed to effectuate the remedial purposes of these acts, which is to protect the investing public from the infinite variety of speculative or fraudulent investment schemes in which the investor has no meaningful influence over the operations of the enterprise nor access to inside information from which to monitor the risks of that enterprise or to protect his investment against the manipulation or overreaching of insiders. See Securities and Exchange Commission v. Glenn W. Turner Enterprises, 474 F.2d 476, 480–81 (9th Cir.1973).

■ The phrase "investment contract" is included in the extensive list of types of securities protected by the RMSA, see 32 M.R.S.A. § 10501(18), but like the federal securities acts, see 15 U.S.C. §§ 77b(1), 78c(a)(10), the RMSA does not explicitly define the characteristics of an investment contract. The federal courts initially defined an investment contract as any scheme that "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Securities and Exchange Commission v. Howey, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).[5] In later cases, however, the federal courts have shifted the focus from "sole efforts" to the question of whether the significant powers of management, and specifically the powers that ultimately affect the success or failure of the enterprise, are retained by parties other than the investor. See United Housing Foundation v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975).

Federal and state courts have also addressed the issue of whether an interest in a general partnership can ever be classified as an investment contract when by the terms of the partnership agreement a partner retains significant powers over the management of the partnership business. Those courts that have determined that such an interest cannot be classified as an investment contract as a matter of law reason that the terms of the partnership agreement, as supplemented by any powers afforded general partners under the state partnership statutes, provide the same essential protections that would be afforded the partners under the securities acts. See, e.g., Banghart v. Hollywood General Partnership, 902 F.2d 805, 807–08 (10th Cir.1990); Rivanna Trawlers Unltd. v. Thompson Trawlers, 840 F.2d 236, 242 n. 10 (4th Cir.1988). Other courts have reasoned that the fact that an investment is

5. Because the term "investment contract" derives from state blue sky laws that predate the federal securities acts, federal case law provides some guidance to state courts as to its interpretation, but is not controlling in the construction of state securities regulation statutes. See Securities and Exchange Commission v. Howey, 328 U.S. at 298, 66 S.Ct. at 1101–02; Corporate East Assoc. v. Meester, 442 N.W.2d 105, 107 (Iowa 1989); State v. Hawaii Market Ctr., Inc., 52 Haw. 642, 485 P.2d 105, 108 (1971).

structured as a general partnership is not wholly determinative of its status as a security. In the latter instance, however, a heavy burden has been placed on the investing partner to produce competent evidence *extrinsic* to the written partnership agreement to demonstrate that the retained powers provided by the agreement are illusory and that the "economic realities" of the transaction actually relegated that partner to an essentially passive role in the enterprise. *See, e.g., Koch v. Hankins,* 928 F.2d 1471, 1478–81 (9th Cir.1991); *Williamson v. Tucker,* 645 F.2d 404, 424 (5th Cir.1981); *Corporate East Assoc. v. Meester,* 442 N.W.2d 105, 107 (Iowa 1989).

We will affirm a summary judgment if the record discloses that there is no genuine issue of material fact and that any party is entitled to a judgment as a matter of law. M.R.Civ.P. 56(c); *see Saltonstall v. Cumming,* 538 A.2d 289, 190 (Me.1988). In the instant case, the record discloses that the partnership agreement of Long Wharf Associates provided the non-managing partners with significant powers, both individually and cumulatively, over the ultimate fate of the partnership. Most of the major decisions of the partnership specifically defined in the agreement could only be made by the unanimous vote of the partners.[6] Each partner was entitled to inspect the partnership books at any time, to receive periodic financial reports from the managing partners, and to call special partnership meetings to discuss any of that partner's concerns about the business of the partnership. Notwithstanding that Liberty by its control of a one-half interest in the partnership could effectively veto any decisions made by the other partners and was immune from removal as the managing partner, the other partners individually retained the right to monitor Liberty's business judgment and cumulatively retained their own veto over Liberty's discretion.

Although the defendants claim that they were so inexperienced and unknowledgeable in business affairs that they were incapable of intelligently exercising their partnership powers, *see Williamson v. Tucker,* 645 F.2d at 424, the Cooks failed to raise the issue in any of their supporting affidavits submitted to the trial court in opposition to Bahre's motion. Pearl's affidavit states that he was recently semi-retired from a job as a supervisor of production in a shoe factory, he had received $7 million in 1986 as a result of a divorce settlement and the sale of his stock in the factory, he had placed his complete trust in an attorney he hired to invest that money in various business enterprises, and the attorney had engaged in highly speculative real estate investments with Liberty and others. We determine, however, that these allegations do not present an issue of material fact regarding Pearl's inability to comprehend the import of the powers specifically afforded him by the partnership agreement that he signed. *Cf. Koch v. Hankins,* 928 F.2d at 1479 (remand necessary to resolve factual issue of investors' degree of business sophistication because no basis for evaluating in record on appeal).

The defendants next contend that they raised a factual issue of whether they relied on alleged oral misrepresentations by Liberty that, despite the express powers afforded them by the partnership agreement, the defendants would only serve as passive investors in Long Wharf Associates. The partnership agreement explicitly provides that it constitutes the entire agreement between the parties, and "there are no agreements, understandings, warranties or representations between the parties with respect to the Partnership except as set forth herein." No issue of material fact having been generated as to the defendants' inability to comprehend the explicit

---

6. Unanimous approval of the partners was required for, *inter alia,* termination of the partnership, distributions to partners of partnership funds, issuance of promissory notes, sales of substantially all partnership assets, early withdrawal of a partner, assignments of any partnership interest, admission of a new partner, substantial amendments to the project's development plan, substantial changes in the partnership budget, partnership contracts in excess of $50,000, and construction of condominiums in excess of the number specified in the agreement.

terms of the partnership agreement, it is also immaterial whether the defendants relied on any oral representations made by Liberty to the contrary. *See Rivanna Trawlers Unltd. v. Thompson Trawlers,* 840 F.2d at 242 ("securities laws were not intended to be substitute for state [common law] fraud actions.").

The defendants next argue that their failure to exercise any of their retained powers creates a factual issue of whether they were intended *ab initio* to act as passive investors by all parties to the transaction. As the record clearly discloses and the defendants concede, they exercised at least one important retained power by participating in the partnership meetings that occurred in 1988 prior to the dissolution of the business, and therefore they cannot now argue that their passive role was implicit in the arrangement from the outset. *See Williamson v. Tucker,* 645 F.2d at 424 (decision by investing partners to attend meetings when trouble arose belies partners' passive role).

Finally, the defendants contend that Liberty actively prevented them from exercising their express partnership powers by failing to hold regular partnership meetings and to provide financial information to the partners as required in the partnership agreement. The defendants did not allege, however, in any of their submissions to the court that they were at any time refused permission to inspect the partnership books or prevented from convening a special partnership meeting to discuss their concerns about the management of the partnership.

On the record presented by this case we determine that the trial court properly found there was no genuine issue of material fact generated in these cases and that Bahre was entitled to a summary judgment against each of the defendants as a matter of law. *See* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 56.2a at 36–37 (2d ed. 1970). Accordingly, we need not address Bahre's claim that the defendants' counterclaims were barred by the statute of limitations.

## II.

Pearl first contends that his corporate shares are not subject to an attachment. We disagree. At common law, shares in a corporation were viewed as intangible, which typically consisted of the right to dividends out of corporate profits and the right to a share of the assets of the corporation at its dissolution. Therefore, in the absence of legislative enactments to the contrary, such shares were considered choses in action and were subject to neither attachment nor execution. *See, e.g., Yazoo & Mississippi Valley R.R. v. City of Clarksdale,* 257 U.S. 10, 21, 42 S.Ct. 27, 30, 66 L.Ed. 104 (1921).

Under both the Uniform Stock Transfer Act and the Uniform Commercial Code, a stock certificate issued to a shareholder as tangible evidence of stock ownership became the primary focus of the attachment process, and an effective levy of attachment could only be made by gaining actual possession of the stock certificates themselves.[7] Therefore, we find ample support for the proposition that the Legislature intended to alter the common law rule against the attachment of corporate shares. The statute governing the attachment of personal property provides that "[a]ll goods and chattels may be attached and held as security to satisfy the judgment for damages and costs which the plaintiff may recover, except such as, from their nature and situation, have been considered as *exempt from attachment according to the principles of the common law as adopted and practised in the State,* and such as are hereinafter mentioned." 14 M.R.S.A. § 4151 (1980 & Supp. 1990) (emphasis added). The term "chattel," when unqualified, is broadly defined

7. The Comment to section 8–317 states:
In dealing with investment securities the instrument itself is the vital thing and therefore a valid levy cannot be made unless all possibility of the security finding its way into a transferee's hands has been removed.... An attachment filed at the issuer's office against certificated securities is ineffective unless the security itself has been surrendered to the issuer.
U.C.C. 8–317, Official Comment (1977).

as "[a]n article of personal property, as opposed to real property," *Black's Law Dictionary* 215 (5th ed. 1979). Whereas the common law proscription against attachment was premised on the intangible nature of the shares to be attached, the tangible nature of stock certificates makes them fully attachable under section 4151 as a "chattel" of the debtor. *Yazoo & Mississippi R.R. v. City of Clarksdale*, 257 U.S. at 21–22, 42 S.Ct. at 30–31 (for purposes of levying on stock, state statute may properly treat certificate of stock as chattel). Further, the exemption statute, 14 M.R.S.A. § 4422, does not list corporate shares as property exempt from attachment. Finally, the Legislature has adopted section 8–317(1) of the Uniform Commercial Code, which provides:

> Subject to the exceptions in subsections (3) and (4), no attachment or levy upon a certificated security or any share or other interest represented thereby which is outstanding is valid until the security is actually seized by the officer making the attachment or levy....

Reading section 8–317(1) and section 4151 *in pari materia* we determine that corporate shares are subject to attachment.[8]

∎ Pearl next contends that shares in the Pearl Company[9] cannot be the subject of a court order entered pursuant to 11 M.R.S.A. § 8–317, requiring Pearl to deposit the shares with his attorney as an escrow agent as a means of effecting a valid attachment by possession. Pearl supports his contention by reference to our decision in *Zamore v. Whitten*, 395 A.2d 435, 441 (Me.1978).

In attachment proceedings involving investment securities section 8–317(6) provides:

> A creditor whose debtor is the owner of a security is entitled to aid from courts of appropriate jurisdiction, by injunction or otherwise, in reaching the security or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by ordinary legal process.

In *Zamore*, we stated that shares of stock in a closely held corporation cannot be classified as investment securities for purposes of 11 M.R.S.A. § 8–101 to 8–408. We based this exclusion on the language of section 8–102(1)(a)(ii), which provides that the shares must be "[o]f a type commonly dealt in upon securities exchanges or markets *or commonly recognized in any area in which it is issued or dealt in as a medium for investment*." (Emphasis added). We interpreted the second alternative clause of the definition to mean shares "no[t] ... commonly recognized in any area *securities exchanges or markets* as a medium for investment." *Id.* at 441 (emphasis added).

∎ Reviewing the decisions of other jurisdictions that have interpreted the scope of Article 8 of the U.C.C., we note that the interpretation set forth in *Zamore* to exclude shares in a closely held corporation is a minority position, which has been adopted by only two other states. *See Rhode Island Hospital v. Collins*, 368 A.2d 1225, 1227 (R.I.1977); *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659,

---

8. We note that corporate shares would also be subject to a turnover order pursuant to the provisions of section 3131(1) governing the enforcement of money judgments. Under that section, all "personal property [owned by a judgment debtor] ... which is not wholly exempt from attachment or execution pursuant to the [exemption statute]" is subject to a turnover order. Unlike section 4151, section 3131 makes clear that the issue of whether property could be the subject of a valid attachment or execution at common law is immaterial, since the issue has been entirely resolved by the enactment of the exemption statutes, which adopt only those common law exemptions explicitly listed in section 4421. Similarly, the proceeds of the sale of corporate shares would also be subject to a turnover order. Section 3131(9) permits a lien on proceeds to the extent that a secured party would have an interest in proceeds under Article 9 of the U.C.C. *See* 11 M.R.S.A. § 9–306 (1964 & Supp.1990). *See New England Mortgage Services, Inc. v. Petit*, 590 A.2d 1054 (Me.1991). Section 9–306(8) permits the creation of a security interest under either Article 8 (certificated or uncertificated securities) or Article 9 (other securities qualifying as "instruments" under section 9–105(1)(i)).

9. Pearl was the sole shareholder of the Pearl Company.

664 (Tenn.1983).[10] The language of section 8–102(1)(a)(ii) neither compels nor supports our statement in *Zamore*. The second alternative definition of a certificated security in section 8–102(1)(a)(ii) does not reiterate the phrase "upon securities exchanges or markets," but requires only that the shares be recognized as a medium of investment in any area in which it is issued. The Official Comment to the Uniform Commercial Code provides:

> Interests such as the stock of closely-held corporations, although they are not actually traded upon securities exchanges, are intended to be included within the definitions of both certificated and uncertificated securities by the inclusion of interests "of a type" commonly traded in those markets.

U.C.C. § 8–102, Official Comment 2 (1977). The Maine Comment to section 8–102 does not specifically depart from the reasoning of the official Comment in this regard. We therefore overrule *Zamore* to the extent that the decision holds that shares of closely-held corporations cannot fall within the definition of a security as provided in section 8–102(1)(a)(ii). In the present case, Pearl undoubtedly could transfer all or any part of his ownership interest in his shares of stock in the Pearl Company to a third party. We find no error either in the court's determination that Pearl's shares in the Pearl Company were of a type commonly recognized as a medium of investment or in its grant of Bahre's motion that Pearl be ordered to place the shares in escrow.

■ Finally, Pearl contends that the court improperly awarded Bahre postjudgment interest on the total judgment of $937,573.05, which includes $130,896.39 in interest accrued on the promissory note prior to the entry of the judgment. Pearl argues that such an award of interest is prohibited by 14 M.R.S.A. § 1602(2) (1980 & Supp.1990) which provides that "[p]rejudgment interest shall not be added to the judgment in determining the sum upon which post-judgment interest shall accrue." We disagree.

Section 1602 also provides that "[i]n all civil actions, except those actions involving a contract or note which contains a provision relating to interest, prejudgment interest shall be assessed." (Emphasis added). In the present case, the sum of $130,896.39 represents the interest pursuant to the terms of the promissory note and not the imposition of the statutory rate of prejudgment interest as provided in section 1602(1). Section 1602(2) provides this amount is properly considered as damages when calculating the amount of Bahre's judgment on which postjudgment interest is allowed under section 1602–A.

■ Bahre and Pearl have stipulated that the trial court improperly allowed postjudgment interest at the contract rate contained in Pearl's promissory note. An award of postjudgment interest may only be calculated at the statutory interest rate prescribed by section 1602–A. We therefore modify the award of postjudgment interest in Bahre's award against Pearl to provide for the calculation of postjudgment interest at the statutory rate and, as modified, affirm the judgments entered against all of the defendants.

The entry is:

Judgment for Robert P. Bahre against Robert C. Pearl modified in accordance with the opinion herein to allow for the calculation of postjudgment interest at the statutory rate, pursuant to 14 M.R.S.A. § 1602–A, rather than at the contract rate, and as modified, affirmed.

---

**10.** The Official Comment to U.C.C. makes clear that the definition of "security" in Article 8 "has no bearing upon whether an interest is a 'security' for purposes of federal securities laws [and by] the same token the definitions of 'securities' for purposes of those laws has no bearing upon whether an interest is a security within the definition of this Article." U.C.C. § 8–102, Official Comment (1977). The different underlying purposes of Article 8 and the securities regulation acts require that their respective definitions of "security" be considered separate and distinct. The former is designed simply to define the relative rights of parties involved in the transfer of securities, while the latter is specifically designed to protect investors from certain speculative or fraudulent investment schemes.

Judgment for Robert P. Bahre against Richard T. Cook and David H. Cook affirmed.

All concurring.