**GIUFFRE ORGANIZATION, LTD.,**
**Plaintiff–Appellant,**

v.

**EUROMOTORSPORT RACING,**
**INC., Defendant–Appellee.**

No. 97–1146.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1997.

Decided April 13, 1998.

Leonard Opperman (argued), Christopher A. Poling, Kunz & Opperman, Indianapolis, IN, for Plaintiff–Appellant.

Paul Deignan (argued), Ancel & Dunlap, Indianapolis, IN, for Defendant–Appellee.

Before BAUER, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Championship Auto Racing Teams, Inc. (CART) organizes "Indy Car" auto races—that is, competitions among cars designed for the Indianapolis 500 and similar, but less famous, events. A share of stock in CART represents not only an investment (and an opportunity to share in whatever profits CART makes) but also a membership, and thus a right to participate in the races. No owner can enter a car without the membership that is linked to ownership of CART stock. Ability to pay for a share is not enough to buy one; existing racing teams care deeply about who is going to be behind the wheel of (or maintain) a car that at 200 miles per hour has the ability to kill other drivers and demolish expensive equipment. Transfer of any CART share requires the approval of CART's board, which may be had only if CART determines that the buyer is fit to race. Both this qualification-and-approval requirement and the linkage between investment and participation in the sport make a CART share more like a franchise such as the Chicago Bulls than like a simple investment in corporate equities. Cf. *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir.1996).

Euromotorsport owned two CART shares, entitling it to enter two cars in CART's Indy Car World Series. Accidents involving Euromotorsport's cars led to economic difficulties. Giuffre Organization, doing business as Go Racing, was flush with cash and looking for an opportunity to enter Indy Car races but lacked the experience CART requires. Euromotorsport's need for cash, and Giuffre Organization's need for experience, had the makings of a deal. Euromotorsport created

a new organization, Eurosports Associates, Inc. (EAI), and agreed to train its drivers, mechanics, and other employees until EAI met CART's requirements for entry. Giuffre Organization funded EAI's business, paid Euromotorsport $240,000 for half of EAI's stock, and loaned Euromotorsport an additional $275,000. Once EAI qualified to enter CART's races, Euromotorsport was to transfer one of its CART shares to EAI. If the transfer occurred, Giuffre Organization could buy out Euromotorsport's interest for $10; otherwise Giuffre Organization could require Euromotorsport to buy its interest in EAI for $270,000. Antonio Ferrari, the president of Euromotorsport, handed one CART share over to Frank Giuffre, the president of Giuffre Organization, to secure its rights under these arrangements. Although the record is unclear, we assume that Frank Giuffre held the share on behalf of Giuffre Organization rather than EAI. The point is debatable but, given our resolution of other issues, unimportant. Many details of the parties' arrangement have been omitted for the same reason.

Before Euromotorsport could raise EAI to CART's standards, an involuntary petition in bankruptcy was filed against it. CART redeemed Euromotorsport's shares for failure to participate in CART's races. Giuffre Organization asked the bankruptcy court to treat it as a secured creditor for the $120,000 that CART paid to redeem the pledged certificate. Bankruptcy Judge Lessen held that a CART share should be treated like stock in a close corporation and therefore as a "certificated security" within the meaning of Art. 8–102 of the Uniform Commercial Code, with the result that a security interest could be perfected by possession. But the district judge reversed, holding that CART's restrictions, which prevented free trading of the stock, removed the certificate from the UCC's definition of "certificated security". This meant that Article 9 of the UCC prescribed the means of perfecting a security interest. Only a security agreement under UCC § 9–203 plus a financing statement filed under UCC § 9–302 could have given Giuffre Organization a security interest, the district judge held. Because the only filed security agreement covered a 1992 Lola chassis, Ferrari's shares in Euromotorsport, and Euromotorsport's portion of EAI's receivables, the proceeds of the certificate were declared available to all of Euromotorsport's creditors. This decision is "final" under 28 U.S.C. § 158(d), see *Unsecured Creditors of White Farm Equipment Co. v. IRS*, 943 F.2d 752 (7th Cir.1991), and Giuffre Organization has appealed.

The events in question occurred in 1993 and 1994, when Indiana (whose law applies) adhered to the 1977 version of Article 8. It has since enacted the 1994 revisions to Articles 8 and 9. Although the parties agree that the 1977 version governs, the changes of 1994 (enacted by Indiana in 1995) bear some attention.

Section 8–321(1) of the 1977 version of Article 8 provides that "[a] security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of Section 8–313(1)." Ind.Code 26–1–8–321(1).[†] There is a corresponding exclusion of securities from Article 9. See UCC § 9–203(1). Section 8–313(1)(a) provides in turn that transfer occurs "at the time [the secured party] or a person designated by him acquires possession of a certificated security." But what *is* a "certificated security"? The definition appears in § 8–102(1):

A certificated security is a share, participation, or other interest in property of or an enterprise of the issuer or an obligation of the issuer which is

(i) represented by an instrument issued in bearer or registered form;

(ii) of a type commonly dealt with on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

---

[†] Indiana's version says "IC 26–1–8–313(1)", but for simplicity we use the references as they appear in the Official Draft approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws. Indiana codified the 1977 version at Ind.Code 26–1–8–xxx and the 1994 version at Ind.Code 26–1–8.1–xxx. Citations to the Indiana Code may be recreated by replacing the xxx with the section number of the UCC citation.

(iii) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.

Clause (ii) has given rise to controversy, exemplified by the district judge's reversal of the bankruptcy judge, about whether shares in closely held corporations are "securities". Compare *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659, 664 (Tenn. 1983); *Gulf Mortgage & Realty Investments v. Alten,* 282 Pa.Super. 230, 422 A.2d 1090 (1980); *Rhode Island Hospital v. Collins,* 117 R.I. 535, 368 A.2d 1225 (1977); *Zamore v. Whitten,* 395 A.2d 435 (Me.1978) (all holding that shares of closely held corporations are not Art. 8 securities), and *Levey v. Burke, Wilson & McIlvaine (In re Bragiel),* 151 B.R. 186 (Bankr.N.D.Ill.1993) (shares in a professional corporation are not "of a type" commonly traded because of ownership restrictions and, therefore, are not Article 8 securities); with *Bahre v. Pearl,* 595 A.2d 1027 (Me.1991) (overruling *Zamore*); *Stancil v. Stancil,* 326 N.C. 766, 392 S.E.2d 373 (1990); *United Independent Insurance Agencies, Inc. v. Bank of Honolulu,* 6 Haw. App. 222, 718 P.2d 1097 (1986); *In re Kontaratos,* 10 B.R. 956 (Bankr.D.Me.1981); and *In re Domestic Fuel Corp.,* 70 B.R. 455 (Bankr.S.D.N.Y.1987) (all holding that shares issued by a close corporation are Art. 8 securities). There was for many years a parallel controversy in federal securities regulation: does the sale of a closely held business via the transfer of its stock entail the sale of a security? *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 2312 (1985), ultimately gave an affirmative answer. The 1994 version of Article 8 clears this topic up through a revised definition of "security" in § 8–102(15):

"Security", except as otherwise provided in section 8–103, means an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:

(i) Which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;

(ii) Which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and

(iii) Which:

(A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or

(B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article.

The new § 8–102(15)(iii)(B) makes it clear that an investment instrument not commonly traded on a securities exchange can declare its own eligibility for coverage under Article 8. And a new § 8–103(a) adds that "[a] share or similar equity interest issued by a corporation, business trust, joint stock company, or similar entity is a security." This incorporates into the UCC the conclusion the Supreme Court reached in Landreth. See Jeanne L. Schroeder, *Is Article 8 Finally Ready This Time? The Radical Reform of Secured Lending on Wall Street,* 1994 Colum. Bus. L.Rev. 291, 360–61 n. 168 (1994).

Given the way the Supreme Court handled closely held corporations in *Landreth,* the resolution of this issue in the 1994 revision of the UCC, and that revision's swift enactment in Indiana, we would be surprised if the Supreme Court of Indiana did not cast its lot with courts holding that stock in closely held corporations can be a security under the 1977 version of Article 8, even if that stock comes with restrictions on transferability (as stock in closely held corporations often does). But CART is not your everyday close corporation—nor are its shares simple investment vehicles. Once shares of ordinary corporate stock have been paid for, the investors have no rights other than to vote for directors (and to receive dividends if any should be declared). Although some close corporations limit investment to current employees, stock ownership does not carry with it a right to *be* employed, let alone an obligation to work (imagine the surprise of an heir told that he had inherited his father's job with his stock). CART certificates are different. They entail not only a right but also an obligation to participate in races. (Recall that CART re-

deemed Euromotorsport's shares because it had not entered enough of the races in the Indy Car World Series.) Members of CART do not expect to make their money in dividends; they buy shares so that they can *race* and thus win prizes and receive endorsement money from sponsors that place advertisements on the cars. The link between the certificate and participation in the races makes CART shares look much more like ownership of a cooperative apartment, which *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), held not to be a security even though it was denominated "stock" and certificated just like investment securities.

The district judge concluded that CART stock is "essentially ... a licensing scheme whereby [CART] determines who is qualified to compete in professional auto racing events". That is closely parallel to *United Housing*, where each share of stock represented one room in a cooperative apartment, and no one could live in the building without owning stock—or own stock without an apartment. The Supreme Court concluded that when the benefits of this arrangement to the tenant came from the apartment rather than the stock, the securities laws should not displace the normal rules of property law. Just so here: both Euromotorsport and Giuffre sought the shares to enjoy the benefits of Indy Car racing, and it would be odd to treat the relations between CART and the car owners as "securities" just because the right to race (vote in setting the rules of the sport, and so on) is represented by a certificate. And here, as in *United Housing*, legends on the certificate proclaim that it may not be transferred (or even pledged) except with the issuer's permission.

■ *United Housing* and its successor *Marine Bank v. Weaver*, 455 U.S. 551, 560, 102 S.Ct. 1220, 1225–26, 71 L.Ed.2d 409 (1982), leave little doubt that a certificate representing a share in CART (and entitling the owner to race one car) is not a "security" for purposes of the federal securities laws. Article 8 does not contain the same language as the Securities Act of 1933, but both the 1977 and the 1994 versions of the UCC imply similar if not identical treatment by defining as "securities" only instruments of a kind that trade on stock exchanges or that represent "investment". Shares of closely held corporations are "of a type" that trades on exchanges (and some end up doing so if the firm grows and goes public), and they represent investments. Shares of CART will never trade on an exchange, no matter how popular auto racing becomes; the identity of each owner is bound to remain important to other owners. And like the district judge we believe that ownership of a CART share does not represent an investment in a security any more than a sports franchise such as the Chicago Bulls or a partnership in a law firm is a security. The partnership (and the CART share) may be costly to acquire, and the position may bring financial reward, but the reward comes from practicing law (or racing) rather than as a return to passive investment. The license or share represents (though it does not produce) the stream of income associated with being in the profession. Lenders may take security interests in income to be received, but the mechanism for doing this is the financing statement under Art. 9 rather than possession under Art. 8 (or "control" of the security under the system adopted in the 1994 revisions).

In diversity litigation under *Erie* all we can do is predict how the state courts will handle the subject when it arrives. Perhaps the Supreme Court of Indiana will never have an opportunity to interpret the definition of a security in the 1977 version of Article 8, but we are reasonably confident that if it did so it would treat a document used to control participation in a professional sport as a "franchise" or something similar rather than as a "security".

AFFIRMED.