BELFAST & MOOSEHEAD LAKE RAILWAY CO. *vs.*
INHABITANTS OF UNITY.

*Contract—unconditional assent required. Special Laws of* 1869, *c.* 206.

April 23, 1867, the inhabitants of Unity voted to take stock in the plaintiff company, *provided* its railroad should be located through that town. June 29, 1868, the directors so established the line of the road as not to pass through that town, and March 15, 1869, the inhabitants rescinded their vote to take the stock: *Held,* that there never was any such proposition by one party, accepted unconditionally by the other, as to constitute a completed contract.

Where the law requires the assent of a town to be indicated by a two-thirds vote, a majority of the voters may recall such assent before it has become binding by acceptance of the town's proposal by the party to whom it is made. If there is any doubtful question under such a provision, it is whether a minority even, comprising more than one third of the legal voters present, cannot withdraw or rescind the former vote.

The Special Law of 1869, c. 206, merely purports to afford a remedy when the "terms and conditions of the subscription have been complied with;" it does not propose to make a contract for the parties where none had previously existed, nor would it have been competent for the legislature to have done so had such been its object.

ON REPORT.

ASSUMPSIT on an alleged promise by the defendants to take three hundred shares of the non-preferred stock of the Railroad Company, and to pay for them at their par value of one hundred dollars per share, made at Unity, February 19, 1868, in consideration of the plaintiffs' promise to sell such shares for said sum of $30,000, to the defendants.

By Special Laws of 1867, c. 380, (incorporating the plaintiff company) § 19, it was provided: "That the corporation shall be authorized to issue non-preferred and preferred stock upon such terms and conditions, and to such persons and corporations, and with such limitations and restrictions as may be deemed for the interests of the subscribers, the success of the corporation and the completion of the road; and cities and towns interested in the construction of the road, or to be benefitted thereby, may subscribe at par value for any amount of either class of said stock by a vote of two-thirds of the legal voters of any such city or town present at any meeting legally called therefor, not to exceed 20 per cent of the amount of the valuation of such city or town; and such vote shall be obligatory on said city or town for the payment of the amount so subscribed; and said cities and towns may issue their bonds for such stock," &c., &c.

This act was approved, February 28, 1867, and the company accepted it, and organized under it July 6, of the same year. Books were then opened for the reception of subscription to the capital stock, and remained open for that purpose till June 29, 1868. Upon these books there was the following entry: "We the undersigned, being a majority of the selectmen of the town of Unity, do hereby, in our official capacity, for, and in behalf of said town, subscribe for three hundred shares of the non-preferred stock of the Belfast and Moosehead Lake Railway, at the par value of one hundred dollars each, amounting to thirty thousand dollars, in accordance with the vote of said town, and the rules and regulations of the directors as herein recorded. Selectmen not personally liable. JAMES FOWLER, JR., } Selectmen of REUEL MUSSEY. } Unity.

Unity, February 19, 1868.

This subscription was professedly made under a vote of the defendants, passed at a town meeting holden April 23, 1867. The warrant calling this meeting stated the subject to be acted upon: "Article 2. To see if the town of Unity will vote  *   *   *   * to subscribe at par value for an amount of non-preferred stock of Belfast and Moosehead Lake Railway Company, to the amount of twenty per cent of the valuation of said town, in case said Railway Company build said road through the town of Unity, and construct a depot for the accommodation of the citizens of said Unity and the travelling public, at some place within a half mile of the centre of Unity Village (so called,) and also with the express understanding and agreement that any amount so subscribed for by said Unity shall not be paid  *   *   *   *   * until enough from responsible parties has been subscribed to defray the expense of constructing said road from Belfast to Newport *via* Unity,"  * *   *   *   *   *.

"Article 3. To see if the town will instruct and empower the selectmen of said town to make such subscription in the books of said company, conditioned that the road and depot shall be so located and built,"  *   *   *   *   *.

"Article 4. To see what amount of the stock of said Railway Company, in case said railroad shall be located through said town, and a depot  *   * built as aforesaid  *   *   *   * said Unity, in its corporate capacity, shall subscribe for in the books of said company,"  *  *   *   *   *.

Under the fourth article of the warrant, Charles Taylor, a voter of the town moved "that we, the citizens of Unity, authorize our selectmen to subscribe for the non-preferred stock of the Belfast and Moosehead Lake Railway Company, to aid in the construction of said railroad from Belfast to Newport, or some other point on the Maine Central Railroad, to the amount of thirty thousand dollars, providing said road runs through Unity, and the full amount of money be raised to build said road according to the specifications in the town warrant calling this meeting;" which motion was carried by a vote of one hundred and thirty-three in its favor, to

sixty opposed to it. The amount proposed to be subscribed did not exceed one-fifth of the town's valuation.

At a meeting of the directors of the Belfast and Moosehead Lake Railway Company, held June 29, 1868, it was voted to adopt a certain specified location which would not pass through Unity. Subsequently the route was changed so as to pass through this town, but the depot was never built at the place designated therefor, and the junction of the road with the Maine Central Railroad was established where it now is, at Clinton Gore instead of at Newport.

On the fourth day of March, 1869, a meeting of the defendants was called to be holden on the fifteenth day of the same month, "to see if the town will vote to rescind the vote, whereby the town voted to take thirty thousand dollars of non-preferred stock in the Belfast and Moosehead Lake Railway Company."

At this meeting, upon a yea and nay vote, seventy-eight voted in favor of rescinding, and sixty-three against it, the moderator refusing to declare the result.

March 3, 1869, the governor approved the Special Law of that year, c. 206, which took effect upon approval, providing : "That the Belfast and Moosehead Lake Railroad Company in addition to the remedy already provided for the collection of the subscriptions to its capital stock and assessments made by said company shall have the right to maintain an action of special assumpsit in the name of said company, to enforce payment of such subscription or assessment. And such action shall be maintained if the terms and conditions of the subscription to the capital stock of said company and the assessments upon it have been substantially complied with, and shall not be defeated by any mere informality in organizing said company, or in electing its officers, or other merely informal acts of the company, or of any of its officers."

On the twenty-first day of February, 1870, the plaintiffs tendered the municipal officers of Unity a certificate of three thousand shares of the capital stock of the Railway Company, and demanded payment therefor, which was refused and the certificate

declined; and on the sixteenth day of March, 1870, this suit was instituted to compel the town to pay for these shares; if upon the facts reported the action is maintainable, it is to stand for trial; otherwise the plaintiffs are to be nonsuit.

*A. G. Jewett* and *W. H. McLellan,* for the plaintiffs.

The act of incorporation authorized the town to subscribe and made it obligatory to pay the amount subscribed; an obligation from which the defendants could not release themselves by a majority vote to reconsider, passed two years after they voted to subscribe, and after the company had acted upon their subscription, made two assessments, and were prosecuting the work of building the road. Certainly, there could be no revocation except by a majority as large as that which passed the vote, i. e., two-thirds of the voters present, nor without notice to the plaintiffs of the rescission. The terms of the subscription were substantially complied with; all comprised in the only article voted upon (the fourth) were completely fulfilled.

*A. Libbey,* for the defendants.

The road was not built upon the line which the town made a condition of its subscription. *Middlesex v. Locke,* 8 Mass., 268; *Middlesex v. Swan,* 10 Mass., 390. The conditions annexed to their vote were unauthorized by the directors, and no contract could exist till they were assented to by the plaintiffs, and the defendants notified of it. *Essex v. Collins,* 8 Mass., 292; *Troy v. Newton,* 8 Gray, 576. The directors voted, virtually, to reject the proposal of the town, June 29, 1868, which left nothing to be done by the town; yet the defendants did vote to rescind, March 15, 1869.

DANFORTH, J. This is an action to recover the assessments upon three hundred shares of the capital stock of the plaintiff company, of which it is alleged the defendants became owners by virtue of their original subscription therefor.

The first question raised is whether or not the defendants ever became the owners of such, or any number of shares. It is not claimed that they were in any other way than by virtue of a contract. Such contract, like any other, if it exist at all, must do so by reason of an assent of each party to every proposition of the other without any modification. "Wherever there is not an assent, express or implied, to the terms of the proposed contract by both parties, there is no mutuality and no contract. Smith on Contracts, (third edition), 171, note; *Jenness v. Mt. Hope Iron Co.,* 53 Maine, 20.

The case finds that books for subscriptions were opened by persons duly authorized therefor, as prescribed by the charter. In these books were certain rules and regulations adopted by the directors, and proposed as terms of the contract by which subscribers were to become owners of the shares subscribed for. The defendants, by their selectmen, subscribed said books for three hundred shares, but in so doing, added other and different conditions than those recorded therein. Those in possession of the books were authorized to sell the shares only upon the terms therein recorded. Before the contract could be completed, the company must in some legal manner assent to the additional propositions of the defendants. This was never formally done. No action in regard to these propositions appears to have been taken by the company until June 29, 1868. At that time the directors voted to locate their road upon a route which did not lead through Unity. As one of the defendants' propositions was that the road should be located through Unity, this was, on the part of the directors, a virtual, if not a direct refusal of their assent to the terms offered by the defendants. Whatever, then, might have been the condition of the parties in relation to the supposed contract up to this time, this rejection of it by the plaintiffs would seem to put an end to it, and no further action would be required on the part of the defendants, unless for the purpose of renewing the negotiations. But these negotiations never were renewed, and the parties not only had not met, but the proposal of the one had

been rejected by the other. But the defendants were not satisfied with this state of things. On the fifteenth day of March, 1869, and before any further action by the plaintiffs, they rescinded their former vote authorizing the subscription, thereby withdrawing their offer. This it was certainly competent for them to do at any time before the offer had been accepted, if not at any time before notice of acceptance had been communicated to them, as held in *Jenness v. Mt. Hope Iron Co.*, before cited. But it is contended that this vote could be rescinded only by the same majority required to pass it. If there is any doubt upon this point, it would seem to be whether or not a minority even, larger than one-third of the voters, could not withdraw or rescind the former vote. The law required a two-thirds vote to authorize a subscription. No binding contract could be made between these parties for the sale of stock, except by the assent of the plaintiffs and "two-thirds of the voters of the town, present at a legal meeting." Clearly, after the meeting of March 15, 1869, no such contract could be made. After that date, there was no assent of a majority, much less of two-thirds, of the voters; and before that time the testimony shows no contract, assented to by both parties. *Essex Turnpike Corporation v. Collins*, 8 Mass., 292, is a case like this in principle and decisive of it.

As, therefore, the contract upon which the action rests fails, it is unnecessary to examine the other points raised in the defence.

It is, however, claimed that the plaintiffs may recover under the provisions of the Special Laws of 1869, c. 206. But the only purport of that act is to afford a remedy where the "terms and conditions of the subscription have been substantially complied with." It does not propose to make a contract for the parties where none had previously existed, nor would it have been competent for the legislature to have done so, if such had been the object.                                        *Plaintiffs nonsuit.*

APPLETON, C. J., WALTON, BARROWS and VIRGIN, JJ., concurred.
DICKERSON, J., dissented.