STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, SS.                          CIVIL ACTION
                                        Docket No. CV-03-146

                                        *PEN-JH-31?? Jr*

James H. Tweedie,
        Plaintiff


                v.                      Decision and Judgment

FILED
UP
K P 8 ___
PENOBSCOT COUNTY

Christopher R. Tweedie et al.,
        Defendants


        An evidentiary hearing was held on the complaint. All parties, including the

representative of the corporate defendants, were present with counsel. After the trial was

completed, the parties filed written argument, which the court has considered in

conjunction with the evidence. In this action, the plaintiff, James H. Tweedie, seeks

various forms of relief based on several claims arising from his basic contention that he

held an interest in the two corporate defendants, Patriot Transport, Inc. (PT) and Patriot

Logistics, Inc. (PL) and that he was improperly deprived of his right to participate in the

income generated by and assets owned by those entities. For the reasons set out below,

the court denies all claims except for one to recover a portion of the corporations' income

generated in 1998, 1999 and part of 2000.

        James Tweedie is a cousin of defendant Christopher Tweedie. Through separate

courses of employment, both had been involved in the trucking industry prior to 1997.

Although the record does not establish persuasively who initiated contact with the other,

in 1997 James and Christopher agreed to work together in an independent brokerage

concern. Prior to that initial contact between James and Christopher, Christopher had

approached one Jude Bradley, a truck driver, about the prospects of starting a new truck-

hauling business. The three began to work with each other. The nature of James' interest

in that business is central to the dispute in this case.

In October 1997, Christopher incorporated the business as "Patriot Transport & Logistics" (PTL). *See* plaintiff's exhibit 12. He identified himself alone as the corporation's incorporator and director. Under the articles of incorporation, as many as three directors could be placed on the board, and the corporation could issue up to 3,000 shares of corporate stock. No shares, however, were issued until September 2000. By 1998, James and Bradley also had become directors of the corporation. *See* plaintiff's exhibit 20. One year later, in November 1999, a meeting was held to change the name of the corporation from Patriot Transport & Logistics to "Patriot Transport, Inc." *See* plaintiff's exhibit 13. The transportation or hauling activities of the corporation were then carried out by that firm, and the brokerage arm of the business was to be conducted by a new corporation, "Patriot Logistics, Inc." *See* plaintiff's exhibit 23. The corporate amendment form recites that the name change was approved was "the shareholders" and that the holders of 3,000 shares were authorized to vote. The articles of amendment are supplemented by an exhibit revealing that persons present at the meeting were Christopher (identified as president and chief executive officer (CEO)) and James (identified as the chief operating officer (COO)). The exhibit states that the corporate clerk and Jude Bradley, the corporation's "Director of Fleet & Safety" were not present at the meeting. Although James contends that this document established that he was a shareholder in PTL as of the date of the meeting, for the reasons noted below, neither he nor anyone else was a corporate shareholder at that time, for the simple reason that the corporation had not issued any stock – to *anyone*, as of that time. Rather, the document reveals only that James, Christopher and Bradley were directors of the corporation. *See also* plaintiff's exhibit 30.

The business continued its operations, with the operations and responsibilities allocated in way suggested by the titles noted above. Christopher was responsible for administrative and financial matters and was involved in the day-to-day operations of the business; James was largely involved, both directly and in a supervisory capacity, in the day-today-work of lining up customers and scheduling runs assigned to PT's trucks and drivers and to independent owner-operators; and Bradley was the company's first-line driver who would receive the first opportunity to haul loads. Initially, most of the work was based on brokering loads for an out-of-state shipping concern. That firm shared the

2

resulting commission with PT, and Christopher and James split PT's share equally. Bradley's compensation was tied directly to the loads he hauled with a truck he purchased at the outset of his involvement with PT. Over time, PT developed other customers whose loads it would arrange to transport. James and Christopher both played material roles in that client development. James, along with another dispatcher who was hired as a PT employee, would line up the loads, and those loads would be hauled either by Bradley or one of a number of independent owner-operators who would lease their services to PT. As PT's business grew, James and Christopher received larger draws from the company, and on several occasions, they also received more substantial distributions totaling $8,000: the two received equal amounts.

PT was treated as a subchapter S corporation, so that the net taxable income was to be reported as personal income on the shareholders identified in the K-1 tax filing. Christopher claimed this income on his returns. From this, although the evidence is not explicit on the point, the court infers that Christopher actually received that money from the corporation. Those amounts were $9,068 in 1998; $51,574 in 1999; and $17,686 in 2000. Although James denied that he received any dividends from the corporations, in fact both he and Christopher received two cash payments based on their personal financial needs. The payments totaled $8,000. James used one of the two payments, amounting to $5,000, to purchase a mobile home to use as his residence, although the company also used it as its place of business. The business then paid a total of approximately $5,000 for improvements to the premises.

In 2000, the relationship between James and Christopher deteriorated. The record contains categories of allegations that one advanced the other: James felt that Christopher was cheating him of corporate proceeds (i.e., amounts beyond the equal salaries that both of them received); that he did not pay the drivers the amount they were entitled to receive; and that Christopher did not consult him adequately on administrative matters, such as hiring decisions. From the other side, Christopher alleges that James was using illegal drugs and in fact shipped them to the business office located in Winterport, which was also James' residence. Without notifying James, Christopher formed a plan to move the business office from the Winterport trailer to a business park in Hermon. Christopher intended to make this move when James was away on vacation. James, however, learned

3

of the plan and promptly met with his attorney for at least part of an afternoon to discuss the situation. Early the next morning, James sent an e-mail to Christopher, to another PT employee and to two family members. In that e-mail, James wrote in part,

> I James Tweedie Jr. of 1031 Main Road North, Winterport, Maine resign my post of Vice President, and 50% owner of Patriot Transport and Logistics, Inc., as of 6:00pm Friday July 7th, 2000. From this day forward, the office will no longer be located @ 1031 Main Road North, Winterport. . . .[N]o employees of Patriot will be welcome or allowed on the premises of my property @ 1031 Main Road North, Lot #6, Skyview Trailer Park, Winterport, Maine. . . .[A]nyone caught trespassing will be prosecuted for criminal trespassing. . . .[A]n armed guard will be present on the premises 24 hours a day.

*See* defendant's exhibit 1. The email went on to indicate that James wanted to receive payment for his interest in the company and hoped for a "speedy resolution of this matter." "Until then, the entire books, load slips office machines & equipment, remaining rolodexes, etc. will be looked after by my attorney." *Id.* Through his trial testimony and his written argument, James attempted to disclaim any intent to renounce any corporate interest he may have had. The court rejects that testimony. He wrote that letter after spending a considerable amount of time with his attorney and reflecting on his options. Further, he sent copies of the email to several family members, who had no involvement with business. Additionally, James testified that he thought seriously about whether or not to send the communication, and he ultimately decided to transmit it. These circumstances all establish that the letter, which he sent to its recipients only after considerable deliberation, represented James' actual wish to separate himself from the company

Later that day, Christopher and others went to the premises to effect the relocation of the business office from the Winterport location. James physically barred them from trying to remove business property from the trailer. The state police were called to the scene, and eventually Christopher took some – but not all -- of the property associated with the business. The property that Christopher was unable to retrieve later became the subject of an action for forcible entry and detainer, which was resolved by agreement. As part of that agreement, the corporations abandoned any claim to the mobile home that James continued to occupy, and he has lived there to the present. From that moment in July 2000, James had no further involvement in the day-to-day business activities of

4

either corporation, and he stopped receiving a salary and other compensation from the business.

James also did nothing to pursue any interest in the company or pursue any claim based on any such interest until after a special meeting of the directors of both PT and PL was scheduled for September 12, 2000. Notices of that unified meeting were sent to James on September 5. Although in July he had resigned his position as vice president, James remained a director of the corporations and thus was entitled to receive that notice and to be present at the meeting. The notices included an agenda, which noted that issues to be addressed at the meeting would encompass consideration of proposed PT and PL corporate by-laws and the issuance of PT and PL corporate stock. James promptly met with his attorney, who wrote to the corporations' counsel requesting, among other things, further information about the proposed by-laws and the proposed stock issuance. From the record evidence, the court finds that corporate counsel sent James' attorney a copy of the proposed by-laws, and that prior to the September 12 meeting, James reviewed the drafts with his attorney. In that letter, James' attorney also expressed James' claim to a half interest in PT. James' attorney advised that James had been unaware of the creation of PL, and thus the letter focused on PT.

At the September 12 meeting, James was in attendance with his lawyer. Christopher and Bradley were also present. The three directors unanimously voted to adopt the proposed corporate by-laws for both corporations that James previously examined with his attorney. *See* plaintiff's exhibits 14, 25 (minutes of PT and PL meetings). As was then permitted by article VII, section 2(b) of those bylaws, the directors then voted on a motion to issue capital shares of both corporations to Christopher and to Bradley only. James voted in the negative, but the motion was approved because Christopher and Bradley voted in favor of it. This resulted in the initial issuance of any PT or PL corporate stock. Christopher and Bradley both received 30 shares of stock in each of the two corporations.

The next day, Christopher and Bradley, as the only shareholders, removed James as a director from both corporations, because under the newly enacted by-laws, a director must also be a shareholder. *See* plaintiff's exhibit 17, 27. This requirement disqualified James from holding a director position. In 2001, Bradley redeemed his shares as

consideration of roughly $15,000 in value (consisting of cash and the conveyance of a trailer), leaving Christopher as the sole record shareholder for both corporations.

In August 2003, James commenced this action against PT, PL and Christopher, seeking relief under a variety of causes of action.

These findings lead to two conclusions that significantly influence the court's analysis of James' claims. First, James never became a shareholder of either corporation. In fact, no one held any shares of PT (the entity that earlier was called PTL) or PL until September 2000, when a majority of the directors voted over James' dissent to issue shares to Christopher and Bradley. By that time, however, because of the email he issued in July,

James had renounced any ongoing interest he may have had in either corporation. James makes two essential arguments in support of his contention that he was a shareholder. First, he argues that the absence of any written certificate to document the issuance of shares does not foreclose his status as a shareholder. In support of this point, he relies on *Zamore v. Whitten*, 395 A.2d 435 (Me. 1978). This, however, misses the fact that the corporation simply did not issue any shares to James. If it had done so, the existence or absence of a written certificate evidencing that issuance would not be dispositive of the more fundamental question of whether James was in fact a shareholder. *See* 11 Bjur and Solheim, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS ("Fletcher"), § 5092 (1995 rev. ed.) (a share certificate "is merely evidence of the holder's ownership rights [in the corporation]. . . .Ownership of the title papers is incident only to ownership in the property.").

This ties into James' second argument, namely, that because he was a founder of the parent corporation (PTL), he is entitled to status as a shareholder of that entity (and, presumably, PL, which PTL/PT spawned). This position is undermined by the controlling provisions of Maine statutory law, which are found in title 13-A.[1] There, a "shareholder" is defined as "one who is *a holder of record* of shares in a corporation." 13-A M.R.S.A. § 102(17) (repealed 2003) (emphasis added). James never was a record

---

[1] Title 13-A was repealed effective July 1, 2003, and replaced by the provisions of title 13-C. *See* P.L. 2001, c. 640. The repealing statute expressly made the provisions of 13-A applicable to acts and transactions that occurred prior to the effective date of title 13-C. P.L. 2001, c. 640, § A-3.

holder of shares in either corporation at issue here. A person who is an incorporator or director of a corporation does not become a shareholder merely because of that relationship with the entity. 13-A M.R.S.A. § 702 (repealed 2003); 1A Fletcher at § 81; *Hodges Realty, Inc. v. John Smiley's Motel, Inc.*, 395 S.E.2d 751, 757 n.11 (W.Va. 1990). Further, a person's mere participation in the corporation in any of the former roles does not mean that the person acquires a financial stake or interest in the corporation. *Hodges Realty*, 395 S.E.2d at 757 n.11. James points to no authority establishing that one who participates in founding a business necessarily becomes a shareholder.

Even beyond this, James argues that Christopher and Bradley acted improperly when they voted in favor of issuing shares only to themselves at the September 2000 corporate meetings. On this basis, he contends that he should have become a shareholder at that time. However, James had abandoned any interest in the corporations through his July 8 email, aside from any claim he may have preserved to compensation for past distributions and other assets that had accumulated up to the date of the email. Thus, to the extent that his claim of entitlement to corporate shares is predicated on his contention that he held an ownership interest in the corporate businesses, his claim fails because he had surrendered any such interest several months prior to the time when the corporations first issued shares. He had no financial position in either corporation at the time of the September events and thus did not suffer any cognizable injury from them.

The second point that emerges from the facts outlined above is that, contrary to Christopher's arguments here, James and Christopher held qualitatively equal positions in the company until James withdrew as a stakeholder in July 2000. The credibility of these two parties does not hold up well. Thus, the court places weight on objective evidence of their roles in developing the business and in managing its affairs. Both were instrumental in founding the company. The first significant customers were Packard, which James lined up, and Stinson Seafood, which was arranged through Christopher's employment there. James and Christopher were paid equally from the commissions generated by the Packard account and, later, from other customers. Both James and Christopher made important contributions that resulted in that client development. They agreed to two cash distributions, in addition to their weekly salaries, which were prompted in part by James' financial circumstances. The amounts paid to James and Christopher were equal. James'

7

responsibilities with the business centered largely on its day-to-day operations; Christopher was charged with most of the administrative and financial issues. Both, however, had supervisory responsibilities over other employees, and neither appears to have had supervisory authority over the other.

The only significant qualitative difference in their respective relationships with the corporations was Christopher's retention, reflected in the tax returns, of year-end corporate income. The best available evidence, however, suggests that James was unaware of this situation, because Christopher managed the financial affairs of the business. Thus, the court attributes the corporations' payment of its income to Christopher as a result of James' ignorance of that arrangement rather than as evidence that Christopher and James had entered into an arrangement where Christopher was to be the only principal in the corporation. James argues that Christopher understated the amount of net income generated by the corporations, contending that the business did not actually incur expenses that were used as deductions from gross receipts, for the cost of pallets and for bank charges. The court finds, however, that the best evidence of the amounts retained by Christopher are the ones stated on the corporate tax returns and then reported as income on his personal return.

These findings allow for a discussion of James' particular claims, which he asserts variously against Christopher and the two corporations.

For the reasons noted above, James never was shareholder in either corporation. Thus, his claim for a judicial declaration that he *was* a shareholder (count 1 of the complaint) fails. Further, he is not entitled to pursue claims on behalf of the corporations in the form of a shareholder derivative action (count 10), which requires that the claimant must be a shareholder. *See* 13-A M.R.S.A. § 627(1)(A) (repealed 2003); M.R.Civ.P. 23A.

Several of James' claims are predicated on his claim that the July 8 email was not effective to disclaim any ongoing financial position in the companies and that he is entitled to compensation based on circumstances post-dating that email. The court has concluded, however, that James purposefully and knowingly relinquished any such position in the corporations. He argues that any such relinquishment resulted from the conduct of Christopher, who, James learned, was trying to squeeze him out of the

8

corporations' affairs. Although this may be true, the fact remains that James voluntarily made the decision to sever his relationship with the business. The court holds him to that choice. This circumstance deprives him of any basis to recover for interference with a future economic expectancy (count 5), which claim is grounded on the assumption of continuing financial benefits from the business (salary, dividends, etc.).[2] It also forecloses relief based on those parts of several other claims (claims for quantum meruit, unjust enrichment and conversion, for example) that implicate entitlement to benefits that James claims accrued subsequent to July 8, 2000. Because James himself terminated the relationship from which such benefits may have flowed, he is not entitled to recovery for future losses.

One of James' claims is based on his contention that at least prior to July 2000 he was entitled to be paid by the corporations as they paid Christopher. Although James frames this claim in a number of ways (that is, in a number of separate counts of his complaint), the cause of action best suited to this claim is quantum meruit. A claim for quantum meruit requires proof that a plaintiff rendered services to a defendant, that the defendant knew of and consented to those services, and that under the circumstances it is reasonable for the plaintiff to expect payment for those services. *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271. That is the case for the work James performed for the corporate defendants. He rendered services to them, and they knew of and consented to those services. Further, it was reasonable for James to expect that he would be compensated for those services based on the same circumstances that prompted Christopher to take (and report as income) the corporations' residual accumulated year-end income. The court need not determine whether the compensation to which James was thereby entitled arose from his role as a founder of the corporation and developer of its growing business, or whether it arose from the more conventional form of services he provided. The dispositive point is that James stood in the same quality of relationship to

[2] In that part of his summation relating to his claim for interference with a future expectancy, James makes a passing reference to evidence that after the events of July 2000, Christopher sent an email to several PT customers suggesting that they should not do business with James and that he had been discharged from employment with PT because of insubordination and theft. This claim fails because, at the very least, James has failed to present any evidence that Christopher's communication was the cause of any damages to James.

9

the corporations as did Christopher. Both were directors; neither was a shareholder; and both provided services to the business. From his conduct, it is evident that Christopher concluded that he was entitled to payment by the corporation of its year-end income balance. None of the defendants contend here that the payments to Christopher were wrongful. Further, because of the structural relationship among James, Christopher and the corporations, he may not now contend that he was entitled to those payments but that James was not. Similarly, the corporations[3], having paid that money to Christopher, are not in a position to contest James' right to such payments.

On his claim of quantum meruit, James' recovery is against the corporate defendants because the parties are the source of the moneys that were due to him. James' working relationship was with the corporations rather than with Christopher. Thus, Christopher is not liable to James on this theory. However, Christopher is liable to James directly because he (Christopher) took and converted money that should have been paid to James, thus seriously interfering with James' right to control and receive the money, which right Christopher established through his own conduct. *See* RESTATEMENT (SECOND) OF TORTS §222A (1965).

The record establishes that in 1998, Christopher took were $9,068 of corporate income; $51,574 in 1999; and $17, 686 in 2000. All of this income is reported on PTL tax returns. There is no evidence that the corporations declared any net ordinary income in 1997, which is the year PTL was incorporated. In early July 2000, James surrendered any financial interest in the corporations. The court is willing to infer that half of the corporations' ultimate net ordinary income was generated during the first half of the year, when James was still active in the business. Therefore, the evidence allows a finding that prior to July 2000, the corporation earned a total of $69,485. Half of this amount is $34,743.[4] However, the corporations paid James and Christopher a total of $8,000 during

---

[3] Put more precisely, PT, because Christopher received corporate year-end income from PTL, which is the same entity as PT; there is no evidence that Christopher received such income from PL.

[4] Bradley became a shareholder in September 2000. Although he testified that he believed that he had an ownership interest in the business prior to the stock issue, none of the parties at bar make that argument. Bradley is not a party to this action, and in fact he eventually redeemed his shares of stock for consideration paid to him. However, the

that time. In the absence of evidence (and in the absence of citations of tax law provided by the parties) to the contrary, the court reduces James' damage claim by the amount he received beyond his draw. Accordingly, James has proven that the corporation should have paid him $26,743 but failed to do so and that Christopher converted a sum in that amount.

To the extent that James may be seen to argue that even beyond the year-end corporate income, he was entitled to additional compensation for his work, he has not established that the value of his services exceeded the amounts paid and the other benefits he received from the corporation, such as improvements to the premises where he continued to live after July 8, 2000. *See William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995) (in claim for quantum meruit, measure of damages is the reasonable value of services rendered).

James also has asserted property-based claims to seek recovery of a share of the corporations' value, including the net value of the corporations' assets. Even if James has established that the nature of his interest in the concerns entitles him to such recovery, he has not proven the amount of the corporations' worth. The evidence simply contains nothing more than fragmentary information about several of the corporate assets. On this record, it is impossible to reach a meaningful determination about the gross value of its assets (tangible and, perhaps, intangible if the corporations had goodwill) and about its liabilities. In his argument, James resorts to reliance on the corporate tax returns. The information in those documents, however, is well short of a sufficient basis to assess the net value of the companies. Thus, without reaching the question of whether the corporations and Christopher could be found liable for this aspect of James' claim, the wholly deficient proof of value precludes an outcome favorable to James.

James has pursued several additional claims against the corporate defendants and against Christopher individually (breach of fiduciary duty (count 3) and constructive fraud (count 4)). Even if James has proven these claims, they would not entitle him to damages beyond the amounts previously addressed in this order.

---

court assesses James' damage claim without regard to any claims Bradley may have had to a share of the business' income, because the parties at bar have framed their positions to exclude Bradley as a principal of the corporations.

In count 2, James seeks an order for an equitable accounting of the corporations' finances. Because James has established only a limited basis for relief in his other substantive claims, any such accounting would be limited to an examination of the corporations' financial records relating to the period of time relevant to James' claim, which ended in July 2000. The court declines to order such an accounting. James has not established any inability to present proof of the corporation's financial condition at the limited times that bear on his successful claims here. Indeed, he attempted to present such evidence at trial, but the court ruled that much of that evidence was inadmissible in the form presented by James. A trial offers a perfectly adequate forum for the presentation of evidence that James now argues should be the subject of an extra-judicial accounting. Under these circumstances, the court denies James' request.

Finally, James has alleged a claim for unjust enrichment (count 8), based on his testimony that income received from Packard was attributed entirely to him in tax documents and as a result, he had to pay personal income taxes on those receipts. Because half of the Packard income was paid over to Christopher, James now claims that he is entitled to compensation for the amount of personal income taxes he paid on the amount that he did not actually receive.[5] The record is barren of any evidence suggesting the amount of additional tax liability that James contends resulted from this arrangement. Thus, without considering the liability claim, the court rejects this cause of action for want of proof of damages.

The entry shall be:

For the foregoing reasons, on count 6 of the complaint, judgment is entered for the plaintiff and against defendant Patriot Transport, Inc. in the amount of $26,743. On count 9, judgment is entered against defendant Christopher R. Tweedie in the amount of $26,743. These judgments are joint and several. The plaintiff is awarded pre-judgment interest at the annual rate of 4.41% and post-judgment interest at the annual rate of 10.36%.

On all other claims, judgment is entered against the plaintiff and for the respective defendant.

---

[5] The record does not answer the question of why, if Packard was a customer of PTL, any documents such as 1099 tax forms would indicate that Packard's payments were made to James and Christopher rather than to the corporation.

Because the court has adjudicated the plaintiff's claims on their merits, the court does not rule on the defendants' motions for judgment as a matter of law, which are therefore dismissed as moot.

When the issue of costs is considered from a functional perspective, *see Seacoast Hangar Condominium II Association v. Martel*, 2001 ME 112, ¶ 31, 775 A.2d 1166, 1173-74, the court concludes that no party has prevailed to an extent that warrants an order requiring one party to pay another's costs. Thus, the court awards no costs of court to any party. The parties shall bear their own costs of court.

Dated: March 29, 2006

Justice, Maine Superior Court
Jeffrey L. Hjelm

JAMES H TWEEDIE JR VS. CHRISTOPHER R TWEEDIE, ET AL
UTN:AOCSsr  -2003-0082901                    CASE #:BANSC-CV-2003-00146
--------------------------------------------------------------------------
JAMES  H. TWEEDIE, JR                                      PL
ATTY BILLINGS, J H.    Tel# (207) 553-7015
ATTY ADDR:75 PEARL ST, SUITE 201 PORTLAND ME 04101


CHRISTOPHER  R. TWEEDIE                                    DEF
ATTY FRAWLEY, ALFRED   Tel# (207) 791-3000
ATTY ADDR:ONE CITY CENTER PO BOX 9546 PORTLAND ME 04112-9546
ATTY CORRIGAN, JOSEPH W.    Tel# (617) 973-6100
ATTY ADDR:PRUDENTIAL TOWER 800 BOYLSTON STREET BOSTON MA 02115


PATRIOT TRANSPORT INC                                      DEF
ATTY DORR, GREGORY P.    Tel# (207) 990-3314
ATTY ADDR:PO BOX 738 BANGOR ME 04401-0738



M=More, Space = Exit:M

Select the EXIT KEY for page selection line.