STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    CIVIL ACTION
                                                  DOCKET NO CV-07-391
                                                  ' '    PEN -

MARY ADDISON,

            Plaintiff,
      v.                                          DECISION and JUDGMENT
EUGENE DAIGLE,

            Defendant.


      Hearing was concluded and briefs filed by October 5, 2009. The plaintiff was

present and represented by counsel, Joseph Ferris, Esq., while the defendant was

present and represented by counsel, James Munch, Esq. The Court will address all

issues raised in the analysis that follows.

A. COUNT I

      1. Existence of a Written Contract

      This lawsuit arises from defendant's construction of a home for plaintiff in 2006.

Her prior residence had been destroyed by fire in March of 2006 and she explored

options to replace it . She found a set of plans for a new home that seemed suitable and

located a builder, Andy Samaras, owner of Hammer-All Home Improvement who

agreed to build the home according to the plans. He provided her with a proposal, Pl.'s

Ex. #3, that quoted a price of $173,430, and it contained certain terms and conditions

that had to be completed before specified payments were due. The homeowner was

required to provide site work, foundation, septic system, water-line to existing well,

cellar floor, and painting. The second floor was to be unfinished except for heat,

plumbing, and drywall. Included in the proposal was a list of allowances, as well as a

list of building materials and related costs. Unfortunately, Mr. Samaras chose to build

1

another house instead of plaintiff's and Ms. Addison was faced with the prospect of finding another builder, one who could complete the project by winter.

Ms. Addison worked at the University of Maine with the defendant, and spoke with him frequently about the difficulties she had encountered in getting her house built. She knew he worked as a computer systems administrator, but also was aware that he bought and fixed properties and had construction knowledge. Mr. Daigle and the plaintiff were friendly and he was concerned about her plight. Ms. Addison became even more distressed after another potential builder backed out of the project and eventually she and Mr. Daigle discussed whether he could provide assistance. Although he was not a contractor, he was familiar with building procedures and practices and knew an engineer, Mr. Manion, who could provide assistance. Defendant indicated that he would consult with Mr. Manion and then decide whether he would take on the project to assist the plaintiff. He eventually agreed to help.

Central to the Court's decision in this case is whether the terms of a construction contract, Pl.'s Ex. #1, are binding on the parties. After agreeing to help, Mr. Daigle went on-line to find a construction contract form and then proceeded to include the Samaras contract terms in the new contract. Both agreements contained an agreement to build the home according to the plans for $173,400 and included a similar schedule of payments, and provided for an exclusion of foundation and site work from the contract. The Samaras contract contained a list of allowances for certain expensive materials and segments of construction such as drywall, plumbing, electrical, chimney, and the homeowner was free to select materials within these allowances. The Daigle contract had no list of allowances but specified that materials were to be specified by the contractor and invoiced to the owner. Additionally, the Samaras contract provided that the flooring would be the responsibility of the owner while flooring was included in the

2

Daigle contract. Both parties agree that the Daigle contract was based on the Samaras contract.

As construction progressed, Ms. Addison needed to borrow funds from a bank to complete the project. The bank required that she have a contract in order to obtain the funds. She indicated this need to Mr. Daigle, which prompted him to draft the contract described above. He obviously gave no independent thought to the cost of the project, did not price materials, and performed no labor cost estimates, but just adopted Mr. Samaris' conclusions in this regard. As the summer progressed without a loan authorization, the plaintiff told the defendant that the bank needed a list of costs and the parties jointly prepared construction cost worksheets. Def.'s Ex. #1, 2, 3, and 4 were prepared for this purpose and Def. Ex. #2 was submitted to the bank . The costs on the worksheet included costs such as foundation and site work that were not included in the parties' contract, and the parties obviously manipulated the entries in various categories in order for the entire project to come in at the target price of $189,500.

Plaintiff asserts that the parties' obligations with regard to the construction of her home are defined in the written contract dated June 20, 2010. Plaintiff also argues that the parole evidence rule excludes consideration of extrinsic evidence offered to change the terms of the written contract. In reply, the defendant argues that extrinsic evidence is admissible to prove that the parties did not intend to be bound by the written contract, which was only prepared because the bank that originated the construction loan required that the parties have a contract. The Court agrees that parol evidence is not admissible to vary, add to, or contradict the terms of an integrated written contract. *Clark v. DiPietro*, 525 A.2d 623, 625 (Me. 1987). If the agreement is partially integrated, extrinsic evidence will be admissible if the additional terms are consistent with the written terms. *Rogers v. Jackson*, 2002 ME 140, ¶10, 804 A.2d 379, 381. Although the issue

does not appear to be decided in Maine, the Court is also willing to rule that extrinsic evidence is admissible on the issue of whether the parties intended to be bound by the terms of a written contract. *See*, Am. Jur. 2nd *Evidence* § 1120; Corbin on Contracts § 85.19; *Zamore v. Whitten*, 395 A.2d 435, 440 (Me. 1998). After reviewing the evidence admitted at hearing, the Court concludes that the parties intended to be bound by the June 20, 2010 agreement.

At the time of the agreement, the parties had been discussing the difficulties plaintiff had encountered in having her home built. The defendant agreed to be responsible for the construction of the home in order to help a friend. Since he wasn't a contractor, he went to the internet to download a form contract and then incorporated the Samaris terms into the form contract. Once he was assured of Manion's assistance, he expressed confidence that he could build a better home than Samaris and felt Samaris' price may have been high. Defendant knew plaintiff needed a contract in order to obtain a loan from the bank and assisted in this regard, but there is no indication that this was the sole reason for the contract to be drafted. There was absolutely no clear, unequivocal agreement between the parties that the written contract was for financing purposes only and not to be enforced. In the absence of an overt agreement that the written contract would not be enforceable, it is difficult to believe that the defendant, an educated, competent person, would have cavalierly signed a document entitled "Construction Contract," thinking it was not enforceable. This is especially true since there is no evidence of the existence of an alternative agreement between the parties. If the agreement were simply cost of materials plus labor, one would expect that there would at least be an agreement about the labor rate for any of the individuals who worked on the house and an agreement governing when payment was due.

Subsequently, when the parties were completing Def.'s Ex. #1, 2, 3, and 4, they mutually discussed why it was necessary to create those documents, and were both aware that it was for financing purposes only. Together, they manipulated the entries in the documents to satisfy the bank, not to reflect the reality of their agreement. Thus, the Court does not construe those documents as constituting any changes or additions to the contractual agreement.

Since the defendant stopped working on the home, he has acted in a manner consistent with having a belief that the June 20, 2006 contract defined the relationship between the parties in the construction project. He wrote to plaintiff's counsel on March 5, 2007, Pl.'s Ex. #9. In this correspondence, he summarized various aspects of the written contract and then stated, "so I am ready to finish the house under my contract with Mary." In the same correspondence, he also stated, "we used Mary's contract with Hammer-All as the basis for the project and added in finishing the exterior trim, siding it in pre-stained cedar shingles, and installing a hardwood floor. Mary said she needed these items in the contract to make it work for the bank. The price stayed the same at $173,400 with some $20,000 in additional labor and material added to the base." By making these comments, the defendant implicitly acknowledged that the parties' obligations were contained in the written contract. Additionally, as plaintiff has pointed out, Defendant has admitted in the course of discovery that the June 20, 2006 agreement constitutes the contract in plaintiff's complaint, Pl.'s Ex. #356 at p.1; Pl.'s Ex. #357 at 1.

The defendant argues that he could not have intended for the contract to be enforceable because he made no independent assessment of price, because the contract provided that plaintiff had control over the selection of materials, yet the contract was for a fixed price; and because plaintiff tracked spending, making it difficult for

5

defendant to monitor contract expenditures. Although these observations are accurate, the Court believes that the defendant reached the agreement without exploring potential consequences. He probably was not thinking about the actual mechanics of complying with the agreement, or what would happen if a dispute arose, but was only trying to provide assistance to the plaintiff. Although it was improvident of him to sign the agreement, he did so intending to be bound by its terms.

There is one curious aspect of the contract that deserves further discussion. Although the Daigle contract was clearly based on the Samaras contract, Mr. Daigle included flooring in the agreement but did not increase the contract price to reflect the increased cost to purchase and install the flooring. He testified that he included it in the contract because plaintiff told him the bank required that the floor be installed and finished now, rather than later. Although his comments about the flooring in Pl's. Ex. 9 are somewhat ambiguous because it is not clear what "add it to the base" means, The Court does not conclude that he intended to install the flooring as an expensive gift to Ms. Addison. With regard to the flooring alone, the Court considers extrinsic evidence concerning whether the parties intended to be bound by the written contract in this regard, and finds that the parties intended that plaintiff pay for the flooring, over and above the full contract price.

2. Breach and Damages

Although the parties disagree on the extent of the breach, they agree the project is not complete. Implicit in the contract is the requirement that the construction be finished according to its terms and since it is not finished, the defendant has breached. The Court will use the plaintiff's format in discussing the elements of the breach and damages, addressing each issue in the order listed in plaintiff's memorandum. Although the plaintiff alleges that the defendant breached the contract by failing to

6

complete the project by December 20, 2006, the Court does not find a breach in this regard. The relevant phrase in the contract, "[w]ork is expected to start July 20th and complete on December 20th, 2006 A.D." falls short of requiring that the project be completed by that date. The Court finds that the word "expected", although awkwardly used, applies to "start" and "complete", and implies that contingencies could reasonably delay completion. Even if this phrase were construed to require completion by December 20, 2010, the defendant has appropriately described several delays attributable to the plaintiff, such as her insistence on certain changes and the delay in her mason's completion of the chimney, that would excuse the delay and result in no award of damages. *See generally* RESTATEMENT (SECOND) OF CONTRACTS, § 269 (1981); *Rockland Poultry Co. v. Anderson*, 148 Me. 211, 216, 91 A.2d 478 (1952). The Court presumes, in the absence of a firm completion date, that performance was to be complete within a reasonable period of time. *See Cellar Dwellers, Inc. v. Dominic D'Alessio, Jr.*, 2010 ME 32, ¶ 16, 993 A2d 1, 10-11.

The other damage claims will now be addressed in order. Some of the costs determined by the Court are lower than the estimates of Mr. Schiele, primarily because his estimates were based on an hourly rate of $45, excessive for the area. Qualified carpenter's assistants are paid between $20 and $25 per hour and Mr. Manion, an engineer and carpenter, only earned $40 per hour while working on the project. In determining damages, the Court will discount the Schiele estimates that include materials and labor by 10%, and the estimates that include labor only by 20% because the work could be performed by a combination of qualified carpenters and assistants. In the ensuing analysis, the discounted amount, reflecting actual damages that the Court is awarding, will not appear in parenthesis, while the full amount designated by Schiele will appear in parentheses.

7

1.Kitchen Cabinets - The Court finds that providing and installing kitchen cabinets was required by the contract and not accomplished. The cost of cabinets to complete the kitchen is $6,000, while the reasonable cost of installation is $2,536 ($3,170). The plaintiff has already purchased the floor cabinets for $3,465, subsumed within the $6,000 estimate.

2. Daylight Basement – The daylight basement opening was not in the plans, and therefore, the Court finds there is no contractual requirement that defendant bare the cost of completion.

3. Bathroom Completion – In order to complete the bathroom according to the plans, including toilets, shower, vanity, soaking tub, roman shower completion, faucets, hookups, and connections, a reasonable expense of $15,210 ($16,900) will be incurred.

4. Reframing Common Bath Area – The Court does not award damages in this category because the parties agreed to the alterations to the plans concerning the common bath area. The $696 spent to hook up one toilet and sink is recoverable.

5. Electrical – Having a licensed electrician make necessary corrections was a necessary expense. Plaintiff is awarded her reasonable expense in this regard, $2,905.

6 Interior Finish – The estimated cost to provide doors, finish, and install them is $5,490 ($6,100). The Court does not find that sheetrock was improperly installed, but finds that the cost of finishing wood floors is included in the contract, since the use of pre-finished flooring was not specified. The reasonable cost for installation and finishing is $4,560 ($5,700). The reasonable cost to trim windows and doors is $3,830 ($4,800). The Court is not including the cost of floor finishing because of the Court's ruling that this expenses was not included in the contract price.

7. Heating - The contract included a euro-type boiler heating system. The allowance in the Samaris contract for the system is $11,500 and, coincidently, the

plaintiff has spent that amount on the installation of a system. The damages related to this element of the breach are $11,500.

8. Siding - The purchase and installation of the siding was required by the contract. It will cost $6,080 ($7,600) to install the siding that is already at the site.

9., 10., & 11. Baseboard – It will cost $2,000 ($2,500) to vent the dryer and finish the interior baseboard, the garage, and wheelchair ramp.

12. & 13. Rear Porch and Deck - The Court is not awarding damages for failing to finish the enclosed porch properly or for failing to finish or improperly installing the rear deck. The plans include neither an enclosed rear porch, nor a rear deck. The Court does not find that the defendant improperly installed the rear porch or deck and finds that his work on the porch/deck was made more difficult by the foundation contractor's failure to install cheek walls in the area. The defendant was not responsible for foundation work.

14. & 15. Front Porch and Entryway – The contract included a front porch, which is incomplete. The reasonable cost of completion is $4,752 ($5,280).

16. Second Floor Completion – The reasonable cost of completing the second floor pursuant to the plans is $4,230 ($4,700).

17. Dormers, Bay Windows – The Court is not awarding costs associated with these claims. The parties orally modified their contract to replace two single dormers in the front with two skylights and to replace a single dormer in the back with a double. Because the defendant installed the skylights and dormer pursuant to the modification, there are no damages. Likewise, the parties agreed mutually to dispense with the bay windows. This was done in recognition of the many "extras" provided by the defendant, including the superior clapboards, many interior accommodations for

9

wheelchair accessibility and other reasons, as well as the framing changes to decrease the number of posts, and to strengthen the building to accommodate snow loads.

The total of these amounts represents the damages total. Although plaintiff incurred out of pocket expense to pay for goods and services that should have been supplied by defendant, $16,628.40 to Davis Builders, $2,950 to Gray Electric, $11,500 to David Brown for heating, and $3,465 to Home Depot for kitchen cabinets; these sums are not being added to the damages amount because the amounts are subsumed in the Schiele estimates. Mr. Schiele performed his inspection in January of 2007, before Davis, Gray, and Brown worked at the home to address some of the shortcomings found by Schiele. Additionally, the kitchen completion estimate contemplated that no cabinets had been purchased, so it included the value of the Sebco cabinets that plaintiff purchased.

## B. COUNTS II AND III

To the extent that the defendant was negligent in his execution of the contract or breached the implied warranty, any damages in relation thereto have already been awarded. In reality, any negligence or warranty breach was minor.

## C. COUNT IV

The Court finds that the defendant misrepresented nothing. In discussing the dormers and bay windows, the defendant agreed to alter or delete them to save money overall on the project and in recognition of the he defendant's willingness to provide more than the contract specified in other areas.

## D. COUNT V

The Court does not award consequential damages. It does not construe the contract as specifying a December 20, 2010 completion date. It was reasonable, because

10

of the changes in he contract agreed upon by the parties and the delays not caused by the defendant, to be working toward completion well beyond that date. Additionally, There is no evidence of the value of the experience of living in the new home versus remaining in the quilt shop, nor for living in an unfinished house. Awarding consequential damages would be based on speculation.

E.  COUNT VI

Plaintiff asserts a claim under the Unfair Trade Practices Act (UTPA), via a violation of the Home Construction Contract Act (HCCA). If the plaintiff prevails on the HCCA claim, she is entitled to a receipt of a civil penalty, 10 M.R.S.A. § 1490(2) and the violation constitutes prima facie evidence of violation of UTPA, 10 M.R.S.A. § 1490(1), that could lead to award of attorney fees. 5 M.R.S.A. § 213(2).

All would agree that the contract signed in this case does not conform to the requirements of 10 M.R.S.A. § 1487. The Court finds that, although there is a violation, the defendant was not aware of the requirements of the law in this regard nor could he be expected to know of the contract requirements because he was not a contractor who was in the occupation of building for others. Instead, he was a person helping a friend and who was expecting a reasonable amount of compensation. He was not seeking an advantage by drafting an inadequate contract and was not misrepresenting anything. He, in fact, was not engaging in any specific unfair trade practice that can be identified. contract price.

According to 10 M.R.S.A. § 1490(2), no home contractor may be held liable for a civil violation under the HCCA "if the contractor shows by a preponderance of the evidence that the violation was an unintentional and a bona fide error, notwithstanding the maintenance of procedures reasonably adopted to avoid any such error." Because this violation was unintentional and a bona fide error, the Court applies this exception

11

in this case and does not order the defendant to pay a civil penalty. The Court recognizes that the exception is only to be applied when the contractor has "procedures reasonably adopted to avoid any such error," and the defendant had no such procedures; but discerns an intent that such procedures not be required of a non-professional contractor who would have no reason to adopt such procedures.

Finally, the plaintiff requests that the Court order the defendant to pay her attorney fees since a violation of the HCCA is prima facie evidence of an unfair trade practice. Because the Court finds that the defendant in fact committed no unfair trade practice, the prima facie effect of the HCCA violation is overcome and the Court does not order payment of attorney fees.

## F. COUNTERCLAIMS

Because the Court has found for the plaintiff on the breach of contract count of plaintiff's complaint, it finds for Ms. Addison on the breach of contract counterclaim. The unjust enrichment and quantum meruit counterclaims are rejected because the Court has already found that a contract governed the obligations of the parties in the construction of this home. All goods and services provided that represent the amount due in the counterclaim were provided under the terms of the contract, and were not provided under circumstances required by unjust enrichment or quantum meruit.

The entry is:

The Court Orders that Judgment be entered for the plaintiff on Count I of her complaint and awards damages in the amount of $65,229, pre judgment interest at the rate of 5.99%, and costs; and that Judgment be entered for the defendant on Counts II through VI.

12

The Court Orders that Judgment be entered for the counterclaim defendant on all counterclaims.

The clerk is directed to incorporate this Judgment into the docket by reference.

Dated: July 30, 2010

WILLIAM ANDERSON
JUSTICE, SUPERIOR COURT

MARY ADDISON  - PLAINTIFF

Attorney for: MARY ADDISON
JOSEPH FERRIS  - RETAINED 07/13/2007
LAW OFFICE OF JOSEPH L FERRIS PA
120 N MAIN ST
BREWER ME 04412

**DOCKET RECORD**

vs
EUGENE DAIGLE  - DEFENDANT

Attorney for: EUGENE DAIGLE
JAMES C MUNCH III - RETAINED
VAFIADES BROUNTAS & KOMINSKY
23 WATER STREET
PO BOX 919
BANGOR ME 04402-0919


Filing Document: COMPLAINT                    Minor Case Type: CONTRACT
Filing Date: 07/13/2007

## Docket Events:

07/16/2007 FILING DOCUMENT - COMPLAINT FILED ON 07/13/2007
        5-9-08 COPY OF COMPLAINT SENT TO THE OFFICE OF THE ATTORNEY GENERAL, CONSUMER AND
        ANTITRUST DIVISION, STATE HOUSE STATION 6, AUGUSTA, MAINE (UNFAIR TRADE PRACTICE)

07/16/2007 Party(s):  MARY ADDISON
        ATTORNEY - RETAINED ENTERED ON 07/13/2007
        Plaintiff's Attorney: JOSEPH FERRIS

07/16/2007 Party(s):  MARY ADDISON
        MOTION - APPROVAL ATTACH/TRUSTEE PROC FILED WITH AFFIDAVIT ON 07/13/2007
        Plaintiff's Attorney:  JOSEPH FERRIS
        ALONG WITH MEMORANDUM OF LAW

07/30/2007 Party(s):  EUGENE DAIGLE
        SUMMONS/SERVICE - ACCEPTANCE OF SERVICE SERVED ON 07/23/2007
        SIGNED BY ATTY JAMES MUNCH III.

07/30/2007 Party(s):  EUGENE DAIGLE
        SUMMONS/SERVICE - ACCEPTANCE OF SERVICE FILED ON 07/25/2007
        Plaintiff's Attorney:  JOSEPH FERRIS

08/15/2007 Party(s):  EUGENE DAIGLE
        RESPONSIVE PLEADING - ANSWER & AFFIRMATIVE DEFENSE FILED ON 08/10/2007
        Defendant's Attorney: JAMES C MUNCH III

08/15/2007 Party(s):  EUGENE DAIGLE
        RESPONSIVE PLEADING - COUNTERCLAIM FILED ON 08/10/2007
        Defendant's Attorney: JAMES C MUNCH III

08/15/2007 Party(s):  EUGENE DAIGLE